# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  | PRISONER |
|---|---|---|
| FRANK ALLEN BERTRAM | : | CIVIL NO. 3:02CV1613 (AVC)(TPS) |
| v. | : |  |
| JOHN ARMSTRONG, ET AL. | : | MAY 27, 2004 |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## I.     INTRODUCTION

This is a civil rights action in which the plaintiff, Frank Bertram, seeks damages against the defendants in their individual capacity for what he alleges to be delays in the diagnosis and treatment of a back condition.  The defendants are John Armstrong, the former Commissioner of the Connecticut Department of Correction ("DOC"), Jack Tokarz, the former Deputy Commissioner for Programs and Treatment at DOC, Mark Strange, the Warden at the MacDougall Correctional Institution ("MCI") from August, 1996 to May, 2001, Edward Blanchette, M.D., the Director of Clinical Services for DOC, and Timothy Silvis, M.D., primary care physician at MCI.  The plaintiff seeks money damages against the defendants in their individual capacity only for alleged violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.[1]

The facts which are pertinent to this lawsuit are as set forth in the affidavits, exhibits and Local Rule 56(a)1 Statement filed herewith.  These documents explain in detail the efforts made to evaluate and treat the plaintiff in Connecticut during the period form April, 2000 until his

---

[1] All claims against the Connecticut Department of Correction were dismissed by the Court by Ruling entered on October 24, 2002.

return to Rhode Island on May 23, 2001. They also summarize the evaluations and treatment received by the plaintiff since his return to the custody of the Rhode Island Department of Correction.

## II.    **SUMMARY JUDGMENT**

Summary Judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. § 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). See also, Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per curiam). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986). The party opposing a motion for summary judgment "may not rest upon the mere allegation or denials of his pleadings, but … must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. § 56(e).

In discussing the history and propriety of summary judgment motions, the Supreme Court noted:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed. Rule Civ. Proc. 1 … Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have not factual basis.

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

To successfully oppose a motion for summary judgment, the plaintiff must present "significant probative evidence to create a genuine issue of material fact." Soto v. Meachum, Civ. No. B-90-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991). "[T]he mere verification by affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary judgment." Greene v. Georgia Pardons & Parole Bd., 807 F. Supp. 748, 751 n.5 (N.D. Ga. 1992) (citing Fullman v. Graddick, 739 F.2d 553, 557 (11th Cir. 1984)). An affidavit in which the plaintiff merely restates the conclusory allegations of the complaint and denies the truth of the affidavits filed by the defendants is insufficient to create an issue of fact that would make summary judgment inappropriate. Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir. 1972). As one court has stated, to permit such an affidavit to form the basis of denying the defendants' motion for summary judgment "would amount to permitting the plaintiff to keep [his] case in court merely by swearing that [he] has a case." Zenith Vinyl Fabrics Corp. v. Ford Motor Co., 357 F. Supp. 133,139 (E.D. Mich. 1973). The record in this case, even when considered in a light most favorable to the plaintiff, fully supports the granting of summary judgment in favor or the defendants.

## III.    ARGUMENT

### A.    The Defendants Were Not Deliberately Indifferent To The Plaintiff's Medical Needs And Did Not Violate His Rights Under The Eighth Amendment Of The United States Constitution

To establish an unconstitutional denial of medical care, an inmate must prove "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 291 (1976). Mere negligence will not support a Section 1983 claim. The conduct complained of must "shock the conscience" or constitute a "barbarous act." McCloud v. Delaney, 677 F. Supp. 203, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir.

3

1970).  A treating physician will be liable under the Eighth Amendment only if his conduct is "repugnant to the conscience of mankind." Tomarkin v. Ward, 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982) (quoting Estelle, 429 U.S. at 105-06).

Inmates do not have a constitutional right to the treatment of their choice. See Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986).  Thus, mere disagreement with prison officials about what constitutes appropriate medical care does not state a claim cognizable under the Eighth Amendment. Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

There are both subjective and objective components to the deliberate indifference standard. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The alleged deprivation must be "sufficiently serious" in objective terms. Wilson v. Seiter, 501 U.S. 294, 298 (1991).  The term "serious medical need" contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, supra, 37 F.3d at 66 (quoting Nance v. Kelley, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)).

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." Chance, supra, 143 F.3d at 702.  "An official  acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 1994)).  Prison officials who are aware of serious risks to an inmate's health may not be found liable "if they responded reasonably to the risk, even if harm ultimately is not averted." Farmer v. Brennan, supra, 511 U.S. at 844, 114 S.Ct. at 1982-83.

4

When the actions of the defendants are measured against these legal standards, it is clear that the defendants did not violate the plaintiff's rights under the Eighth Amendment and that summary judgment in their favor is appropriate.

### 1. Timothy Silvis, M.D.:

Ironically, Dr. Silvis pursued more treatment and diagnostic avenues on behalf of the plaintiff than anyone else in Connecticut or Rhode Island yet finds himself as a defendant in this case. From the very onset of the plaintiff's complaints regarding headaches and back pain, Dr. Silvis attempted different medication treatments and diagnostic x-rays of the sinuses and the lumbar spine. The x-rays revealed some mild degenerative changes in the lumbar spine and some mild mucosal thickening most likely due to chronic sinusitis. (Local Rule 56(a)1 Statement, paras. 13-16). When the plaintiff later requested specific medications for his returning headaches, Dr. Silvis ordered the requested medications. (Local Rule 56(a)1 Statement, para. 17).

On October 25, 2000 when the plaintiff reported some leg weakness, hesitancy on urination and ataxia of the lower extremities, Dr. Silvis sent a request to the Utilization Review Committee ("URC") for an MRI of the head fearing that the plaintiff may have a brain lesion. (Local Rule 56(a)1 Statement, para. 18). When the plaintiff reported an increase in the severity of his headaches and nausea on October 26, 2000, Dr. Silvis notified Dr. Blanchette immediately and both agreed that the plaintiff should be sent to the University of Connecticut Health Center ("UCHC") for further evaluation. The plaintiff was transported to UCHC that day. (Local Rule 56(a)1 Statement, para. 19).

The plaintiff was admitted overnight to the John Dempsey Hospital for observation. While at the hospital, he underwent an MRI of the head. He also was evaluated by Neurology

specialists and ENT specialists.  The MRI of the head was negative for any brain lesions while noting an area of enhancement in the internal auditory canal.  The ENT evaluation confirmed the presence of a small auditory canal lesion which was thought to represent a small acoustic neuroma or some mild chronic sinusitis.  These conditions were not felt to be related to the headaches.  (Local Rule 56(a)1 Statement, paras. 20-21).

In his  Complaint, the plaintiff notes that there was no audiogram or follow-up MRI of the head conducted following his discharge from John Dempsey Hospital or October 27, 2000 although the ENT specialist had suggested that they may be done at some point in the future. There is no indication that the small lesion in the auditory canal was in any way related to the plaintiff's headaches, back pain or leg weakness.  Upon discharge, the plaintiff's headaches were noted to be resolved.  (Rule 56(a)1 Statement, paras. 22-23).  After the plaintiff's return to Rhode Island on May 23, 2001, there was no mention of any auditory problems at the time of the plaintiff's intake physical assessment.  (Exhibit V to Silvis Affidavit).  In addition, there is no indication in the records provided from Rhode Island that the plaintiff requested an audiogram or follow-up head MRI in the months following his return to Rhode Island.  When he was seen and evaluated by Dr. James McLennan in Rhode Island on January 31, 2002, Dr. McLennan noted that a review of an MRI of the brain did not show any hyper-intensity in the auditory canal nor was there any evidence of deafness or word understanding difficulty.  (Exhibit Z to Silvis Affidavit).  There is no indication that the plaintiff has undergone any treatment for any auditory canal issue since his return to Rhode Island on May 23, 2001.

While at the John Dempsey Hospital on October 26, 2000, the plaintiff received a neurological evaluation conducted by Dr. Leslie Wolfson and Neurology Residents.  He had been referred for a neurological evaluation due to his recurrent headaches and more recent

complaint of back pain accompanied by leg weakness and a numb feeling over his lower back and torso.  The results of the neurological examination were relatively normal.  No neurological deficits were noted that would suggest the need for further neurological evaluation.  There was no recommendation for an MRI of the thoracic spine.  (Rule 56(a)1 Statement, paras. 21, 37, 38 & 39).

Upon his return to MCI from John Dempsey Hospital on October 27, 2000, Dr. Silvis had the plaintiff admitted to the MCI infirmary for further observation.  When the plaintiff complained of some difficulty urinating, Dr. Silvis ordered some urine tests which came back negative.  Despite the absence of any recommendation for further follow-up, Dr. Silvis sent in a request to the URC for an MRI of the plaintiff's lumbar spine to further assess the plaintiff's complaint of leg weakness and numbness.  (Local Rule 56(a)1 Statement, para. 24).  The MRI of the lumbar spine was conducted on December 8, 2000.  It showed that the plaintiff had spinal stenosis which is a degenerative disease characterized by a narrowing of space in the spine.  In the plaintiff's case, the loss of space was due to the bulging of some of the discs.  (Local Rule 56(a)1 Statement, para. 25).  The pressure on the spinal cord created by the spinal stenosis can cause symptoms (numbness and leg weakness) similar to those reported by the plaintiff.  (Rule 56(a)1 Statement, paras. 40, 68).  Recognizing that surgical intervention might become a treatment option at some point in the future, Dr. Silvis forwarded a request to the URC for a neurosurgical opinion with respect to the MRI findings.  (Local Rule 56(a)1 Statement, para. 26).

Patients with disc disease have good days and bad days.  When at MCI, the plaintiff's symptoms would fluctuate quite dramatically as evidenced by the observations of many of the medical staff at MCI as well as Dr. Silvis and Dr. Blanchette.  Despite the importance of continuous observations in making clinical assessments, the plaintiff insisted on leaving the MCI

infirmary on December 19, 2000.  At that time, he was noted to be ambulating quite easily with practically no symptoms of unsteady gait or hyperflexion.  (Rule 56(a)1 Statement, paras. 27, 28, 57).  Following his return to the general population on December 19, 2000, Dr. Silvis did not receive any further communication from Mr. Bertram or about Mr. Bertram until February 2, 2001 when he was contacted by the URC which had noted that Mr. Bertram appeared to be doing much better in December, 2000.    The URC was questioning the need for any further neurological evaluation in view of his improved condition.  Dr. Silvis noted that he had not seen the plaintiff since he had signed out of the infirmary and would have to see him again for an update on his condition.  (Rule 56(a)1 Statement, para. 29).  After complaining to nursing staff that his symptoms seemed to be worsening, the plaintiff was put on the M.D. sick call list for further evaluation by Dr. Silvis.  When Dr. Silvis saw him on March 19, 2001, Dr. Silvis noted that the plaintiff would use the quad cane on occasion and that he continued to report ambulation difficulties and some loss of sensation.  On March 23, 2001, Dr. Silvis sent in another request to the URC noting that the plaintiff's back issues did not appear to be resolving and renewing his request for a neurosurgical evaluation.  (Rule 56(a)1 Statement, paras. 30-32).

During the first few weeks of April, 2001, Rhode Island staff were reviewing the request for a neurosurgical evaluation.  (Rule 56(a)1 Statement, para. 34).  The request was approved and an appointment was scheduled for June, 2001.  (Exhibit S to Silvis Affidavit).  On April 30, 2001, Dr. Silvis insisted that the plaintiff be admitted to the MCI infirmary due to his reported instability.  On May 9, 2001, he was noted to be ambulating easily with a quad cane.  On May 10, 2001, the plaintiff signed himself out of the MCI infirmary.  Dr. Silvis did not see him again.  (Rule 56(a)1 Statement, paras. 35-36).  While not directly involved in the decision to

return the plaintiff to Rhode Island, Dr. Silvis agrees that it was a prudent and appropriate decision. (Rule 56(a)1 Statement, para. 58).

The actions of Dr. Silvis were quite reasonable under the circumstances. He requested an MRI of the lumbar spine even though it was not requested or recommended by any outside consultant. When the MRI of the lumbar spine showed degenerative spinal stenosis, he recognized that there may be a need for future surgical intervention and put in a request with the URC for a neurosurgical follow-up evaluation despite the fact that the plaintiff was observed to be ambulating easily. He could have continued to monitor the plaintiff on a regular basis but the plaintiff insisted on returning to the general population. He saw the plaintiff again and provided the URC with an update on the plaintiff's condition when asked to do so.

Dr. Silvis can only request outside referrals. He does not control the review process nor does he decide when or if an outside referral will take place. The finding of spinal stenosis became the focus of attention in terms of assessing the need for subsequent follow-up evaluations and possible surgical intervention. When a subsequent MRI of the lumbar spine was performed in Rhode Island in November, 2001, it was felt that the plaintiff suffered from only mild degenerative disc disease which did not require any surgical intervention.

None of the specialists in Connecticut who saw the plaintiff recommended an MRI of the thoracic spine. None of the medical professionals in Rhode Island felt that there was any urgent need for an MRI of the thoracic spine since the plaintiff was not referred for one until November, 2001. From his review of the medical records from Connecticut and Rhode Island and his personal observations of the plaintiff, it was Dr. Wolfson's opinion that the plaintiff's level of spasticity and numbness was clearly more advanced in January, 2002, then it was in Connecticut.

Indeed, Dr. McLennan noted on January 31, 2002 that the plaintiff's symptoms had gotten progressively worse over the past year.

Intraspinal archnoid cysts are quite rare and symptoms associated with spinal cord compression are more likely to be caused by spinal stenosis as was thought to be the case when the plaintiff was in Connecticut.  If no specialist recommended an MRI of the thoracic spine and no medical professional in Rhode Island made a referral for such an MRI until November, 2001, it doe not seem reasonable to expect that Dr. Silvis would make such a referral.  If the plaintiff is suggesting that Dr. Silvis and other medical professionals in Connecticut were negligent in failing to diagnose a thoracic arachnoid cyst, a claim of medical malpractice does not constitute an Eighth Amendment violation.  Hathaway, supra, 37 F.3d at 68.

The record shows that Dr. Silvis was conscientious and responsive to the plaintiff's health complaints over a period of several months.  Once the plaintiff signed himself out of the medical unit in December, 2000, he was not referred back to Dr. Silvis until he was placed on the M.D. sick call list in March, 2001.  Dr. Silvis sees patients in the infirmary on a regular basis. He would not see general population inmates until they are triaged and put on the M.D. sick call list.  That is one of the reasons that Dr. Silvis had wanted him to remain in the infirmary in December, 2000.

There is no evidence that Dr. Silvis violated the plaintiff's rights under the Eighth Amendment.

### 2. **Edward Blanchette, M.D.:**

The only factual allegations in the Complaint pertaining to Dr. Blanchette are in paragraphs 25, 48, 49, 50 and 135.

In paragraph 25 of the Complaint, the plaintiff asserts that Dr. Blanchette and Dr. Silvis agreed that his symptoms warranted immediate action on October 26, 2000. On that date, Dr. Blanchette did approve the plaintiff's admission to the emergency room at John Dempsey Hospital based on the severity of the plaintiff's headaches as reported to him by Dr. Silvis. After being seen and evaluated at John Dempsey Hospital, Dr. Blanchette was informed verbally that no lesion had been found and that there was no recommendation for any neurological follow-up visits. (Rule 56(a)1 Statement, para. 42).

Dr. Blanchette had no further contact with anyone regarding the plaintiff until November 28, 2000 when the plaintiff stopped him in the hallway of the MCI medical unit while he was conducting an Infectious Disease Clinic. The plaintiff mentioned his visit to the John Dempsey Hospital on October 26, 2000 and then described the emergency room physician as a quack. He expressed dissatisfaction with his stay at the hospital and left the impression that he was never seen or evaluated by anyone. Dr. Blanchette became concerned over these unusual accusations and pulled the plaintiff's medical file which was located at MCI. Upon reviewing the file, Dr. Blanchette noted that the plaintiff had been admitted to the hospital, remained overnight, received an MRI of the head and received evaluations by an ENT consultant and a Neurologist. Dr. Blanchette then pointed out to the plaintiff that he appeared to be given appropriate tests and evaluations while at the hospital contrary to his earlier assertion. While they may have discussed the fact that the Neurologist found inconsistencies between the symptoms reported by the plaintiff and the results of the neurological testing, he was seen by one of the most respected neurologists in the field and Dr. Blanchette was comfortable in his belief that the plaintiff had received a thorough neurological evaluation. (Rule 56(a)1 Statement, paras. 43-44).

11

With respect to the allegations in paragraph 50 of the plaintiff's Complaint that Dr. Blanchette told the plaintiff on November 28, 2000 that there were "tests to check his physical complaints" but that nothing was done and there was "no physical exam," Dr. Blanchette was at MCI on that date to conduct an Infectious Disease Clinic.  He was not the regular primary care physician at MCI nor was he asked to conduct any emergency physical exam of the plaintiff.  He took the time to review the plaintiff's medical records and answer the plaintiff's questions.  He noted in the record that the plaintiff would be going to John Dempsey Hospital for an MRI of the lumbar spine on December 8, 2000.  He could not tell the plaintiff the date of the scheduled MRI for security reasons.  In view of all that had been done prior to November 28, 2000 and the upcoming MRI of the lumbar spine, the plaintiff's assertions in paragraph 50 are simply untrue.  He had undergone physical exams and a number of tests with a further test scheduled for December 8, 2000.  (Rule 56(a)1 Statement, para. 45).

In paragraph 135 of the Complaint, the plaintiff asserts that he wrote to Dr. Blanchette on April 25, 2001complaining of numbness and difficulty urinating.  A search of applicable records has not revealed any such correspondence.  The plaintiff did send an inmate request form to the MCI medical unit on April 25, 2001 with similar complaints.  The response section of the inmate request form indicates that it was received by Elaine Lukas and then endorsed by Dr. Silvis who saw the plaintiff on April 30, 2001 as reflected in the chart entry for that date.  As noted earlier, Dr. Blanchette is not assigned to direct care at MCI except for his infectious disease clinics and would not have received this request form.  (Rule 56(a)1 Statement, para. 46).

Following his conversation with the plaintiff at MCI on November 28, 2000, Dr. Blanchette did not receive any further communication regarding Mr. Bertram until he received a call form the Attorney General's Office sometime near the end of April, 2001,

advising him that a Habeas Corpus Petition had been filed by the plaintiff in the State Superior Court and that it would soon be scheduled for a hearing. Dr. Blanchette was asked to review the habeas petition and the amended petition as well as the plaintiff's medical file in preparation for any hearing that may be held on the petition. One of Dr. Blanchette's responsibilities as the Director of Clinical Services for DOC is to consult with the Attorney General's Office on pending habeas matters that involve medical issues. (Rule 56(a)1 Statement, para. 48).

After reviewing the plaintiff's medical file including the MRI of December 8, 2000, it was Dr. Blanchette's opinion that the plaintiff should be transferred back to his home state of Rhode Island. Spinal stenosis is a condition that does require some monitoring. Dr. Blanchette felt that the plaintiff would likely require further neurological evaluation at some point in the future and might even require surgical intervention. Under such circumstances, maintaining an inmate in the receiving state can be cumbersome and inefficient given the extra level of review and approval required under the interstate compact. (Rule 56(a)1 Statement, paras. 50-51). Dr. Blanchette's decision was buttressed by many years of experience in facilitating the return of inmates to Connecticut who develop a medical or mental health condition in an out-of-state placement that requires non-routine medical care. Connecticut has hundreds of inmates in out-of-state placements and the return of inmates to Connecticut for medical/mental health reasons is a regular occurrence. Having the inmate back on Connecticut removes a source of delay and allows for medical decisions to be based on direct observations rather than reports from other jurisdictions. Similarly, it is normal to return out-of-state inmates incarcerated in Connecticut to their home jurisdictions when the likely need for non-routine medical care becomes apparent. (Rule 56(a)1 Statement, para. 53).

Dr. Blanchette notified the URC and Attorney General's Office of his opinion regarding the return of the plaintiff to Rhode Island.  It was agreed that DOC would pursue the return to Rhode Island as soon as possible.  Dr. Blanchette then spoke with the interstate compact administrators for Connecticut and Rhode Island regarding the desirability of returning the plaintiff to Rhode Island.  It was agreed that the plaintiff would be returned to Rhode Island as soon as the transfer could be arranged and this agreement was reported to the Court at the habeas hearing on May 9, 2001.  At the request of the Court, Dr. Blanchette notified the Rhode Island DOC Health Services Director of the MRI results and suggested that the plaintiff might benefit from further neurological evaluation in Rhode Island to evaluate the appropriateness of surgical intervention.  Mr. Bertram returned to Rhode Island on May 23, 2001.  (Rule 56(a)1 Statement, paras. 54-56).

As explained above, Dr. Blanchette was contacted regarding Mr. Bertram on three occasions.  On all three occasions, his actions were reasonable and responsible.  There is no evidence whatsoever that Dr. Blanchette engaged in any actions that could be described as a violation of the plaintiff's rights under the Eighth Amendment to the United States Constitution.

### 3.     **Warden Mark Strange:**

In paragraph 69-71 of the Complaint, the plaintiff asserts that he handed Warden Strange a note to the effect that he was having problems getting treatment for his back and that he was told by medical staff that the treatment is pending approval of the URC and the Rhode Island officials.  He further asserts that he was told later that day that Warden Strange had inquired as to his medical status and was told by the URC that they are doing what they can and must await Rhode Island approval.

Warden Strange does not recall receiving any written communication from the plaintiff relating to health issues and a search of the inmate correspondence files at the MCI Warden's Office has not revealed any such written communication.  (Rule 56(a)1 Statement, para. 72).  Also, Warden Strange does not recall any verbal discussion with the plaintiff as alleged in paragraphs 126 and 143 of the Complaint.  (Rule 56(a)1 Statement, para. 74).

A Warden tours the correctional facility on a daily basis and it is certainly not unusual for inmates to approach him with any complaints they may have on any number of subjects.  This could happen several times on each tour.  It is unreasonable to expect that a Warden is going to recall every encounter with every inmate.

If the plaintiff had stopped the Warden to complain about being sent for a follow-up evaluation relating to the MRI findings, he would more than likely have checked with the MCI medical staff to insure that they were aware of the plaintiff's concerns and that the concerns were being addressed.  (Rule 56(a)1 Statement, para. 75).  In this case, if the medical staff had reported to Warden Strange that the URC and Interstate Compact Office were waiting for Rhode Island to review the medical issues and approve a further evaluation, then Warden Strange would have reported this to the plaintiff.  (Rule 56(a)1 Statement, para. 76).  It would be an appropriate response for the Warden to have made such an inquiry and to have reported the response to the plaintiff.  The medical staff must make a determination as to whether a medical condition requires immediate emergency intervention or whether it can be handled on a non-emergency basis.  Warden Strange does not have the medical expertise to override the judgment of medical professionals that they are doing what they can to address the inmate's complaint.  (Rule 56(a)1 Statement, para. 77).  While Warden Strange was aware that the plaintiff had filed a Habeas Corpus petition regarding a health issue, he knew that the Attorney General's Office would be

handling the matter with the assistance of appropriate medical staff such as Dr. Blanchette as is the case with any medical habeas.

The medical professionals who were familiar with the plaintiff were aware that he would most likely require further evaluation for his spinal stenosis and possible future surgical intervention. No one had viewed the plaintiff's condition as a medical emergency requiring immediate hospitalization and emergency intervention. They were also aware of the problems associated with the pre-approval process for an inmate from another state who will likely require non-routine evaluation and treatment. This recognition led to the decision to transfer the plaintiff back to Rhode Island. It would not have been appropriate for Warden Strange to have second guessed the opinions and decisions of the medical professionals as to the most appropriate response to the plaintiff's likely need for further evaluation. Prison administrators who lack medical expertise "must necessarily place their confidence in the reports of prison doctors whenever an inmate disputes a medical opinion as to what treatment is necessary and proper." McEachern v. Civiletti, 502 F. Suppp. 532, 534 (N.D. Ill. 1980).

### 4.     Commissioner John Armstrong and Deputy Commissioner Jack Tokarz:

The allegations with respect to Commissioner Armstrong and Deputy Commissioner Tokarz are contained in paragraphs 108 and 131 of the Complaint and relate to a letter the plaintiff wrote to Commissioner Armstrong on March 23, 2001 and the response to the letter which he received from Deputy Commissioner Tokarz.

The letter from the plaintiff and the response thereto are attached to the affidavit of Jack Tokarz as exhibits A and B. In his letter, the plaintiff states that he is having problems getting tests and treatment for a back condition due to the need for approval from the URC and Rhode Island. He asked for any assistance that the Commissioner could offer in the matter.

Commissioner Armstrong asked Deputy Commissioner Tokarz if he would check into the plaintiff's Complaint and the status of DOC's response to his complaint and then prepare a reply to the letter. (Rule 56(a)1 Statement, para. 79). Given the thousands of inmates in Connecticut and the numerous responsibilities of the Commissioner of DOC, it is reasonable for the Commissioner to ask a Deputy Commissioner to investigate and respond to an inmate request.

Upon inquiring as to the status of the plaintiff's complaint regarding evaluation and treatment for a back condition, Deputy Commissioner Tokarz learned that Dr. Silvis had recently seen the plaintiff and provided the URC with an updated report on his back condition. He further learned that the updated information had been forwarded to the Rhode Island DOC for review and decision as to whether or not they would approve further evaluation. Deputy Commissioner Tokarz then informed the plaintiff by letter dated April 6, 2001 of the information he had learned. (Rule 56(a)1 Statement, para. 80). He does not recall receiving any further communication from the plaintiff. (Rule 56(a)1 Statement, para. 81).

Commissioner Armstrong and Deputy Commissioner Tokarz certainly did not ignore the plaintiff's request. They did check the status of his complaint and were told that additional information had been sent to Rhode Island for their review. As noted previously, except in an emergency, prior approval for non-routine medical care is required for any inmate in an out-of-state placement under the Interstate Compact. This is standard procedure and happens in many cases. No one suggested that there was an emergency requiring immediate evaluation or treatment. The response received by Deputy Commissioner Tokarz seemed quite reasonable. (Rule 56(a)1 Statement, para. 82). At the time that Deputy Commissioner Tokarz responded to the plaintiff's letter, the Rhode Island DOC officials were reviewing the request from DOC as well as the requests received directly from the plaintiff. (Exhibit R to Silvis Affidavit).

17

Commissioner Armstrong and Deputy Commissioner Tokarz had no basis for attempting to override the judgment of the medical staff and interstate compact staff from Connecticut and Rhode Island who were familiar with the plaintiff's health issues and were trying to make a decision as to how best to handle his back condition which would likely require further evaluation and possible surgical intervention. The decision was made shortly thereafter that the plaintiff should return to Rhode Island so that the interstate compact pre-approval process would no longer be an issue.

The evidence shows that Commissioner Armstrong and Deputy Commissioner Tokarz acted appropriately in response to the plaintiff's letter of March 23, 2001 and were not in any way deliberately indifferent to his request. Responding to a letter from an inmate, without more, is generally considered insufficient to constitute personal involvement in the actions giving rise to an inmate complaint. Abdush-Shahid v. Coughlin, 933 F. Supp. 168, 182 (N.D.N.Y. 1996); Eng v. Coughlin, 684 F. Supp. 56, 66 (S.D.N.Y. 1988). Even if the Court were to determine that Commissioner Armstrong and Deputy Commissioner Tokarz were personally involved in the actions giving rise to the plaintiff's complaint, they acted properly in consulting with medical staff regarding the plaintiff's complaint. See McEachern v. Civiletti, supra; Ross v. Kelly, 784 F. Supp. 35, 46 (W.D.N.Y.) ("understandable and appropriate" for prison official to defer to medical opinions of prison doctors); aff'd, 970 F.2d 896 (2d Cir.), cert. denied, 506 U.S. 1040 (1992); Liscio v. Warren, 718 F. Supp. 1074, 1082 (D. Conn. 1989) ("prison administrator … justifiably may defer to the medical expert regarding treatment of inmates"), rev'd on other grounds, 901 F.2d 274 (1990).

**B.**    **The Defendants Did Not Violate The Plaintiff's Rights To Equal Protection Under The Fourteenth Amendment**

In paragraphs G an H under the "Claims For Relief" section of the Complaint, the plaintiff asserts that the defendants, in denying him timely access to specialist consultations while providing it to similarly situated inmates, have denied him equal protection of the law.

In the first place, the plaintiff had access to specialist services on a number of occasions as reflected in the affidavits and exhibits submitted herewith. Nowhere in the Complaint does the plaintiff identify the "similarly situated inmates" to whom he refers or the services which those similarly situated inmates purportedly received. If he is referring to the fact that as an interstate compact inmate his non-routine medical services must be approved in advance by the sending state, he has pointed to no other interstate compact inmate for whom these same procedures do not also apply.

There is a distinction between interstate compact inmates for whom pre-approval must be sought and Connecticut inmates incarcerated in Connecticut who are not subject to these pre-approval requirements.   "Prison administrators, when making classifications, 'need only demonstrate a rational basis for their distinctions.'"  Smith v. Coughlin, 748 F.2d 783, 787 (2d Cir. 1984) (quoting Jones v. North Carolina Prisoners' Union, Inc., 433 U.S. 119, 134, 97 S.Ct. 2532, 2542 (1997).  Since the State of Rhode Island would be paying for any non-routine diagnostic and treatment services for any of their inmates placed out-of-state, they would want to be able to review in advance the rationale for such services and then decide whether to approve the procedure in the receiving state or have the inmate returned to Rhode Island.  The sending state may also feel more comfortable if their own medical professionals could observe and examine the inmate and make treatment decisions, based on their own observations.  This is true

for any state and clearly serves as a rational basis for the pre-approval distinction in non-emergency cases.

There is no evidence which would support a claim of denial of equal protection.

## C.     The Defendants Are Entitled To Qualified Immunity

The doctrine of qualified immunity shields state officials from liability for damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). The Second Circuit has described the circumstances where qualified immunity would apply as follows:

> a government official sued in his individual capacity … is entitled to qualified immunity in any of three circumstances:  (1) if the conduct attributed to him is not prohibited by federal law …; or (2) where the conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct …; or (3) if the defendant's actions was 'objective[ly] legal[ly] reasonable[ ] … in light of the legal rules that were clearly established at the time it was taken.' These three issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third.

X-Men Security, Inc. v. Pataki, 196 F.3d 56, 65-66 (2d Cir. 1999) (citations omitted).

A right is clearly established if a reasonable person in the defendant's position should know that his or her actions violate that right. The unlawfulness must be apparent. McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2d Cir. 1999) (citation omitted). In other words, a state official should not be forced to have to defend his actions against civil rights challenges unless the state of the law at the time of the alleged conduct gave him "fair warning" that his actions were unlawful. Hope v. Pelzer, 122 U.S. 1508, 1516 (2002).

In the present case, several measures were taken to address the plaintiff's complaints of headaches, back pain, leg weakness and numbness as summarized in paragraphs 68-69 of the

Rule 56(a)1 Statement. The plaintiff signed himself out of the MCI infirmary making it difficult if not impossible to observe the extent of any improvements or deterioration. Dr. Silvis did not see him again until March 19, 2001 when he was referred to M.D. sick call by the nursing staff. At that time, Dr. Silvis wrote an update as to his observations regarding the plaintiff's condition. Dr. Silvis did more to address the plaintiff's complaints than anyone else in Connecticut or Rhode Island.

Dr. Blanchette had limited contact with the plaintiff. In October, 2000, he approved the plaintiff's admission to the emergency room at John Dempsey Hospital for evaluation of severe headaches and more recent complaints of back pain and numbness. In November, 2000, Dr. Blanchette took time from his Infectious Disease Clinic to pull the plaintiff's medical file and discuss with him the tests and evaluations that were done during his earlier admission to John Dempsey Hospital. He also noted at that time that the plaintiff was scheduled to go for an MRI of the lumbar spine on December 8, 2000. His next involvement with the plaintiff occurred in late April, 2001 when he was asked to review the plaintiff's medical records in preparation for a hearing on the plaintiff's pending Habeas Corpus petition. After reviewing the medical file and the MRI of the lumbar spine, Dr. Blanchette felt that the spinal stenosis would require further neurological evaluations and possible surgery. It became clear to him at that time that the plaintiff would be better off in Rhode Island where he could receive follow-up attention without the need for the cumbersome pre-approval reviews. When inmates in out-of-state placements are felt to be in need of non-routine medical evaluation and/or treatment, it is standard practice to return them to the sending state where such future non-routine care can be accomplished more efficiently with fewer delays. Dr. Blanchette informed the Rhode Island Health Services

Director of the plaintiff's MRI results and suggested that Rhode Island send the plaintiff for further neurological evaluation upon his return to Rhode Island.

With respect to defendants Armstrong, Tokarz and Strange, there is no claim that they did not follow-up on the plaintiff's communications with them. Commissioner Armstrong, through Deputy Commissioner Tokarz, responded appropriately by contacting medical staff and being informed that Connecticut had recently sent an update on the plaintiff to Rhode Island for review and were awaiting Rhode Island's decision on the request for neurosurgical follow-up evaluation. While Warden Strange does not recall any discussion with the plaintiff regarding medical issues, the plaintiff's allegations with respect to Warden Strange reflect that the Warden spoke with medical staff regarding the plaintiff and was informed that a request for non-routine, non-emergency medical follow-up had been submitted to Rhode Island and that they were awaiting a decision pursuant to the Interstate Compact.

The actions of all of the defendants were appropriate under the circumstances. While it was learned several months after the plaintiff's return to Rhode Island that he had a rare form of spinal lesion that was thought to be an arachnoid cyst of uncertain etiology, this discovery was made only after the plaintiff's symptoms had been slowly getting worse over the several months prior to its discovery. All of the Connecticut medical professionals were proceeding on the basis of the results of the tests and evaluations that had been done and their actions can certainly not be considered a violation of any clearly established constitutional right.

## IV.     CONCLUSION

For all of the foregoing reasons, the defendants' Motion for Summary Judgment should be granted.

DEFENDANTS
John Armstrong, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY: _____/s/_____
Richard T. Couture
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct05480
E-Mail:  richard.couture@po.state.ct.us
Tel.: (860) 808-5450
Fax: (860) 808-5591


## **CERTIFICATION**

I hereby certify that a copy of the foregoing Memorandum in Support of Motion for

Summary Judgment was mailed on this 27th day of May, 2004, to:

Frank Allen Bertram, No. 74523
Adult Correctional Institution
Medium Security 1
P.O. Box 8274
Cranston, RI  02920


_____/s/_____
Richard T. Couture
Assistant Attorney General