### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
|  |  | PRISONER |
| FRANK ALLEN BERTRAM | : | CIVIL NO. 3:02CV1613 (AVC)(TPS) |
| v. | : |  |
| JOHN ARMSTRONG, ET AL. | : | MAY 27, 2004 |

### DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT

The defendants respectfully represent, pursuant to Local Rule 56(a)1, that the following material facts are not in dispute:

1.     Timothy Silvis, M.D.,  is a physician licensed to practice Medicine in the State of Connecticut since 1983.  He is Board Certified in Internal Medicine.  He was employed part-time at the Osborn Correctional Institution from 1989 to 1995 and part-time at the MacDougall Correctional Institution ("MCI") from 1995 to 1997.  He has been employed full-time at MCI since April, 1997.  (Silvis Affidavit, paras. 1-3).

2.     Edward Blanchette, M.D., is a physician licensed to practice Medicine in the State of Connecticut since 1975.  He is Board Certified in Internal Medicine and Infectious Disease.  (Blanchette Affidavit, paras. 1-2).

3.     Dr. Blanchette has held various positions with the Connecticut Department of Correction ("DOC") since 1984 including Hospital Clinical Director at the Osborn Correctional Institution, Medical Director at the MacDougall Correctional Institution and Acting Director of DOC Health Services.  (Blanchette Affidavit, para. 3).

4.     Dr. Blanchette is currently the Director of Clinical Services for the DOC and has held this position since 1996.  His duties as Director of Clinical Services include consultation

with Correctional Managed Health Care staff when requested, screening requests for emergency room admissions, facilitating the interstate transfers of inmates where medical issues are involved, and review and consultation with the Attorney General's Office with respect to medical Habeas Corpus petitions.  (Blanchette Affidavit, para. 4).

5.    In addition to his duties as Director of Clinical Services for DOC, Dr. Blanchette also conducts Infectious Disease Clinics ("I.D. Clinics") at the MacDougall Correctional Institution ("MCI") and the Bridgeport Correctional Center.  The Infectious Disease Clinics at MCI are conducted on the average of two to three times per week.  (Blanchette Affidavit, para. 5).

6.    Dr. Blanchette is not a primary care physician at MCI or any other correctional facility.  His direct care responsibilities are limited to the I.D. Clinics which he conducts at Bridgeport Correctional Center and MCI.  (Blanchette Affidavit, para. 6).

7.    Leslie Wolfson, M.D., is a physician licensed to practice Medicine in the State of Connecticut and he is Board Certified in Neurology.  (Wolfson Affidavit, para. 1).

8.    Dr. Wolfson is a Professor of Neurology at the University of Connecticut School of Medicine.  He has served as Chief of Neurology at the John Dempsey Hospital and Director of Neurology at Hartford Hospital since 1990.  (Wolfson Affidavit, paras. 2-3; Exhibit A to Wolfson Affidavit).

9.    Mark Strange is currently employed with the DOC as the District Administrator for the southern district of the state.  He has held this position since May, 2003.  He was the Warden at MCI during the period August, 1996 through May, 2001.  (Strange Affidavit, paras. 1-2).

10.    Jack Tokarz retired from DOC in April, 2003.  At the time of his retirement and for several years prior thereto he was the Deputy Commissioner for Programs and Treatment at DOC.  (Tokarz Affidavit, paras. 1-2).

11.    Mr. Frank Bertram was transferred to Connecticut from Rhode Island pursuant to the Interstate Corrections Compact on October 11, 1991.  He went back to Rhode Island on December 6, 1991 and then returned to Connecticut  on December 31, 1991.  Mr. Bertram remained in the custody of the Connecticut Department of Correction ("DOC") from December 30, 1991 to May 23, 2001, at which time he returned to the custody of the Rhode Island Department of Correction.   (Silvis Affidavit, para. 4, Exhibits A, B and C to Silvis Affidavit).

12.    Under the terms of the Interstate Compact Agreement with the State of Rhode Island, except in the case of an emergency, the receiving state must receive advance authority in writing from the sending state before incurring medical expenses for diagnostic and treatment services that are considered beyond the scope of routine health services provided by the correctional medical staff.  (Silvis Affidavit, para. 5, Exhibit D to Silvis Affidavit).

13.    Dr. Silvis saw Mr. Bertram at the MCI infirmary on April 20, 2000 concerning his Hepatitis C and headaches he had been having for a few weeks.  Sinus x-rays that had been taken on March 28, 2000 had shown that Mr. Bertram had mild left maxillary sinusitis.  At that time, Dr. Silvis prescribed an antihistamine and a nasal spray.  (Silvis Affidavit, para. 6; Exhibits E, F and G to Silvis Affidavit).

14.    On July 6, 2000, Mr. Bertram told Dr. Silvis that the antihistamine had not helped his headaches.  He also complained of chronic back pain.  Dr. Silvis prescribed some different medications for his sinuses as well as Motrin for pain.  Dr. Silvis also ordered an x-ray of the

lumbar spine and an additional sinus x-ray. (Silvis Affidavit, para. 7; Exhibits F and G to Silvis Affidavit).

15.  The x-rays of the lumbar spine and sinuses taken on July 13, 2000 revealed some degenerative changes of the lumbar spine and mild mucosal thickening of the left maxillary sinus most likely related to chronic sinusitis. (Silvis Affidavit, para. 8; Exhibit H to Silvis Affidavit).

16.  Dr. Silvis next saw Mr. Bertram on August 21, 2000, at which time he complained of back spasms. He had fair range of motion with no body tenderness in the vertebral area. Dr. Silvis discussed with him the degenerative changes noted on the lumbar spine x-rays and changed his medication to Anaprox since he reported that the Motrin was not helping. Dr. Silvis also advised Mr. Bertram not to engage in sports or weight lifting. (Silvis Affidavit, para. 9; Exhibits F and G to Silvis Affidavit).

17.  On October 16, 2000, Mr. Bertram informed the nursing staff that his headaches were back and his legs were weak. He asked that he be given some more Erythromycin and Motrin as they seemed to help with the headaches. Dr. Silvis entered an order for a continuation of these medications on October 20, 2000. (Silvis Affidavit, para. 10; Exhibits F and G to Silvis Affidavit).

18.  Mr. Bertram returned to the MCI infirmary on October 25, 2000. He reported to Dr. Silvis at that time that his legs were weak and that he had some hesitation when urinating. There was marked ataxia of the lower extremities and poor heel-to-toe gait. Dr. Silvis was concerned that Mr. Bertram may have a neurological lesion so he sent in a request to the Utilization Review Committee ("URC") of the Connecticut Managed Health Care Program for an MRI of the head. (Silvis Affidavit, para. 11; Exhibits G and I to Silvis Affidavit).

19.   While monitoring Mr. Bertram in the MCI medical unit on October 26, 2000, he began to report a terrible headache with nausea.  Dr. Silvis called Dr. Edward Blanchette, the Director of Clinical Services for DOC, and he agreed that Mr. Bertram should be sent to the University of Connecticut Health Center ("UCHC").  (Silvis Affidavit, para. 12; Exhibit F to Silvis Affidavit).

20.   Mr. Bertram was admitted to John Dempsey Hospital at UCHC on October 26, 2000 and remained until the next day.  While at the hospital, he was evaluated by Neurology and ENT specialists and underwent an MRI of the head.  The results of these evaluations and tests are set forth in the Discharge Summary, MRI report and consultation reports attached to the Affidavit of Dr. Silvis.  (Silvis Affidavit, para. 13; Exhibit J to Silvis Affidavit).

21.   The neurological findings were inconsistent with some of the conditions reported by Mr. Bertram.  He was noted to have a negative Babinski, negative Rhomberg, 5 of 5 strength in lower extremities and positive sensation to light touch and pin touch in the extremities.  The objective neurological evaluation was quite normal and no further neurological workup was felt to be necessary.  (Silvis Affidavit, para. 14; Exhibit J to Silvis Affidavit).

22.   The MRI of the head showed no lesions.  There was a small acoustic neuroma in the auditory canal and mild chronic sinusitis which was not felt to be causing the headache.  (Silvis Affidavit, para. 22; Exhibit J to Silvis Affidavit).

23.   Upon discharge from John Dempsey Hospital, Mr. Bertram was noted to have no further complaints of headaches and no neck stiffness.  His condition was deemed stable.  (Silvis Affidavit, para. 16; Exhibit J to Silvis Affidavit).

24.   Upon his return to MCI on October 27, 2000, Mr. Bertram was admitted to the facility infirmary for continued observation.  When Dr. Silvis saw him on October 30, 2000, he

reported difficulty with urination.  At that time Dr. Silvis ordered some urine tests which came back negative.  Since the MRI of the head that was done at John Dempsey Hospital showed no significant findings, Dr. Silvis sent in a request to the URC for an MRI of the lumbar spine to further assess the lower extremities.  This request was forwarded to the Rhode Island DOC. Verbal approval from Rhode Island was received on November 22, 2000.  The MRI was scheduled for December 8, 2000.  (Silvis Affidavit, para. 17; Exhibits K and L to Silvis Affidavit).

25.  The MRI of the lumbar spine conducted on December 8, 2000 showed spinal stenosis as set forth in the MRI report.  Spinal stenosis is a degenerative disease characterized by narrowing of space in the spine.  In Mr. Bertram's case, the loss of space was caused primarily by the bulging of some of the discs.  (Silvis Affidavit, para. 18; Exhibit M to Silvis Affidavit).

26.  While surgical intervention in the form of a laminectomy is one form of treatment for spinal stenosis, it is seldom recommended without allowing for a period of further observation and evaluation.  Recognizing that surgery might be an option at some point in the future, Dr. Silvis forwarded a request for a neurosurgical evaluation and opinion on December 13, 2000.  (Silvis Affidavit, para. 19; Exhibit N to Silvis Affidavit).

27.  Throughout his stay in the MCI infirmary, Mr. Bertram was noted by several different medical staff persons to be walking with what appeared to be exaggerated movements. On some occasions he would be seen to be walking with a steady gait in a very normal fashion while on other occasions he would be quite unsteady.  On December 4, 2000, Dr. Silvis noted that his hyperflexion had improved significantly.  The inconsistency of Mr. Bertram's presentation made clinical assessment difficult at best.  (Silvis Affidavit, para. 20; Exhibit F to Silvis Affidavit).

28.   As difficult as it was to get a true assessment of Mr. Bertram's condition when he was in the infirmary, his decision to leave the infirmary on December 19, 2000 made it impossible to chart any day-to-day progress or deterioration.  Nevertheless, Dr. Silvis did not order Mr. Bertram to remain in the infirmary as he made it clear that he wished to be discharged to population and he was ambulating very easily with practically no symptoms of unsteady gait or hyperflexion at the time of discharge.  (Silvis Affidavit, para. 21; Exhibit F to Silvis Affidavit).

29.   Following his discharge from the MCI infirmary on December 19, 2000, Dr. Silvis did not receive any further communication from Mr. Bertram or about Mr. Bertram until February 2, 2001 when Dr. Silvis was contacted by the URC which had noted that Mr. Bertram appeared to be doing much better in December, 2000.  They had questions as to whether they should pursue approval from the Rhode Island DOC regarding a further neurological workup regarding the earlier MRI findings of spinal stenosis in view of the improved condition.  Dr. Silvis noted at that time that he would have to see Mr. Bertram again in the medical unit to update the URC on his condition.  (Silvis Affidavit, para. 22; Exhibits F and O to Silvis Affidavit).

30.   Thereafter Mr. Bertram was seen on the medical unit by the MCI nursing staff who noted that he was complaining of increased numbness and inquiring about the status of a follow-up neurological consultation.  (Silvis Affidavit, para. 23; Exhibit F to Silvis Affidavit).

31.   Mr. Bertram was then placed on the M.D. sick call list and was seen by Dr. Silvis on March 19, 2001.  At that time Dr. Silvis noted that he was sometimes walking with a quad cane and sometimes without the cane.  Dr. Silvis further noted that his reported ambulation and loss of sensation issues were not resolving.  (Silvis Affidavit, para. 24; Exhibit F to Silvis Affidavit).

32. On March 23, 2001, Dr. Silvis forwarded to the URC a follow-up request for a neurological consultation noting his observations of March 19, 2001. The URC, through the Connecticut Interstate Compact Office, provided the Rhode Island DOC with Dr. Silvis' updated assessment to assist them in deciding whether to approve a referral for further neurological evaluation. (Silvis Affidavit, para. 25; Exhibit P to Silvis Affidavit).

33. At or about the time that Dr. Silvis had sent a follow-up assessment and request to the URC, Mr. Bertram was writing letters to Connecticut and Rhode Island correctional officials complaining about difficulties in obtaining follow-up diagnosis and treatment for his degenerative back condition. (Silvis Affidavit, para. 26; Exhibit Q to Silvis Affidavit).

34. At the time that Mr. Bertram was corresponding with officials regarding his requests for follow-up evaluation and treatment, Rhode Island correctional and medical staff were reviewing the request for neurological follow-up. (Silvis Affidavit, para. 27; Exhibit R to Silvis Affidavit).

35. On April 30, 2001, Mr. Bertram reported to Dr. Silvis that his symptoms relating to his instability were worsening. Although Mr. Bertram refused Dr. Silvis' request to be admitted to the MCI infirmary, Dr. Silvis insisted that he remain in the infirmary for his own safety. (Silvis Affidavit, para. 28; Exhibit F to Silvis Affidavit).

36. On May 9, 2001, Dr. Silvis saw Mr. Bertram ambulating around the infirmary quite easily with his quad cane. On May 10, 2001, Mr. Bertram signed himself out of the MCI infirmary. Dr. Silvis did not see him again after he signed out of the infirmary. (Silvis Affidavit, paras. 29, 31; Exhibits F and T to Silvis Affidavit).

37. During his admission to John Dempsey Hospital on October 26, 2000, Mr. Bertram was referred to the Neurology Department for an assessment in view of his complaint of

headaches and ataxia.  Mr. Bertram was first examined by Residents in the Department who prepared a written report of their findings.  Dr. Wolfson then reviewed their report, examined Mr. Bertram and noted his concurrence with their findings.  (Wolfson Affidavit, para. 4).

38.   When Mr. Bertram was examined by Dr. Wolfson and the Residents, his primary complaint had to do with recurrent headaches which had worsened to the point where he was transported to the hospital for evaluation.  He also reported a more recent onset of lower back pain accompanied by leg weakness and a numb feeling over his lower back and torso which was making him unsteady on his feet.  Upon exam, Mr. Bertram was found to have good muscle strength in all extremities, positive sensation to pin touch in extremities and trunk, negative Rhomberg, deep tendon reflexes that were 2-3$^+$ bilaterally, grossly intact cranial nerves, intact rapid alternating hand movements and ability to stand on one leg with effort.   (Wolfson Affidavit, para. 5; Exhibit B to Wolfson Affidavit).

39.   Mr. Bertram received a thorough neurological examination with input and observations from the Neurology Residents and Dr. Wolfson.  The results of the exam were quite normal and were not consistent with some of the symptoms reported by Mr. Bertram.  They did not detect any neurological deficits that would suggest the need for a further neurological workup at that time.  Given the relatively normal neurological findings, the fact that the primary complaint related to Mr. Bertram's headaches and the fact that an MRI of the head had been done, Dr. Wolfson did not see any indication at that time for an MRI of the thoracic spine.  (Wolfson Affidavit, para. 6).

40.   Mr. Bertram returned to John Dempsey Hospital on December 8, 2000 for an MRI of the lumbar spine.  The pressure on the spinal cord which often results from spinal stenosis and

disc bulges produce leg weakness and numbness similar to that reported by Mr. Bertram. (Wolfson Affidavit, para. 7).

41.    The only paragraphs of the Complaint which contain any factual allegations relating to Dr. Edward Blanchette are paragraphs 25, 48, 49, 50 and 135.

42.    In paragraph 25 of the Complaint, Mr. Bertram asserts that on October 26, 2000, Dr. Timothy Silvis and Dr. Blanchette agreed that Mr. Bertram's symptoms warranted immediate action.  As noted in paragraph 4 above, one of Dr. Blanchette's responsibilities as Director of Clinical Services is to screen requests for emergency room admissions. Dr. Blanchette received a call from Dr. Silvis on October 26, 2000 indicating that Mr. Bertram had been having headaches which had gotten much worse.  He had been nauseous due to the severity of the headaches and his lower extremities had become weak.  Based on the severity of the headaches as described to Dr. Blanchette, he approved an admission to the emergency room for Mr. Bertram where they could assess for the presence of any brain lesion.  Whenever Dr. Blanchette authorizes an emergency room admission, he always receives a verbal summary of the results of the visit.  In Mr. Bertram's case, Dr. Blanchette was informed that no lesions were found, that there was no recommendation for any neurological follow-up visits and that the headache had pretty much resolved at the time of discharge on October 27, 2000.  (Blanchette Affidavit, para. 8; Exhibit F to Silvis Affidavit).

43.    Following Mr. Bertram's visit to the John Dempsey Hospital on October 26-27, 2000, Dr. Blanchette had no further contact with anyone regarding Mr. Bertram until November 28, 2000 when Mr. Bertram stopped him in the hall of the MCI medical unit.  Dr. Blanchette was at MCI that day conducting an Infectious Disease Clinic when Mr. Bertram stopped him in the hall.  Although Dr. Blanchette does not recall ever having met Mr. Bertram prior to

November 28, 2000, it was his impression that Mr. Bertram knew who he was. Mr. Bertram mentioned his visit to the John Dempsey Hospital emergency room on October 26, 2000 which Dr. Blanchette had authorized and proceeded to describe the emergency room physician as a quack. He expressed dissatisfaction with his emergency room visit and left the impression that he was never seen or evaluated by anyone at the hospital. (Blanchette Affidavit, para. 9).

44. Following his initial encounter with Mr. Bertram on November 28, 2000, Dr. Blanchette was concerned over Mr. Bertram's accusations in that it ran counter to his years of experience with John Dempsey Hospital emergency room visits where evaluations are usually conducted regarding patient complaints. Dr. Blanchette told Mr. Bertram that he would pull his medical file which was located in the MCI medical unit and review it. After pulling his file, Dr. Blanchette noted that Mr. Bertram had been admitted to the hospital, remained overnight, received an MRI of the head and received evaluations by an ENT consultant and a neurologist. Dr. Blanchette pointed out to Mr. Bertram that he appeared to be given appropriate tests and evaluations while at the hospital contrary to what Mr. Bertram had told him a few minutes earlier. They may well have discussed the fact that the neurologist found inconsistencies between the symptoms reported by Mr. Bertram and the results of neurological testing. The neurologist who saw Mr. Bertram was Leslie Wolfson, M.D. He is the Chief of Neurology at John Dempsey Hospital and very well respected in the field. Dr. Blanchette was comfortable in his belief that Mr. Bertram received a thorough neurological evaluation. (Blanchette Affidavit, para. 10).

45. In his concluding remarks in paragraph 50 of the Complaint, Mr. Bertram asserts that Dr. Blanchette told him there were "tests to check his physical complaints" but nothing was done and there was "no physical exam." As noted earlier, Dr. Blanchette was at MCI conducting

an Infectious Disease Clinic. He does not provide primary care to inmates at MCI except in the context of the Infectious Disease Clinics. Dr. Blanchette did take time out to review Mr. Bertram's file and try to answer his questions—not to give him a physical exam. Dr. Blanchette noted in Mr. Bertram's file that he would soon be going to John Dempsey Hospital for an MRI of the lumbar spine although he could not tell him the exact date for security reasons. In view of all that had been done prior to November 28, 2000 and the upcoming MRI of the lumbar spine, Dr. Blanchette strongly disagrees with Mr. Bertram's assertions in paragraph 50 of the Complaint that nothing had been done. (Blanchette Affidavit, para. 11).

46.  In paragraph 135 of the Complaint, Mr. Bertram assets that he wrote to Dr. Blanchette on April 25, 2001 complaining of numbness and difficulty urinating. A search of applicable records has not revealed any such correspondence. Mr. Bertram did send a inmate request form to the MCI medical unit on April 25, 2001 with similar complaints. The response section of the inmate request form indicates that it was received by Elaine Lukas and then endorsed by Dr. Silvis who saw Mr. Bertram on April 30, 2001 as reflected in the chart entry which is part of Exhibit F to the affidavit of Dr. Silvis. Dr. Blanchette was not aware of any inmate request form from Mr. Bertram as he was not assigned to direct care at MCI except for the infectious disease patients who he sees in the clinic. (Blanchette Affidavit, para. 12; Exhibit A to Blanchette Affidavit).

47.  Following Dr. Blanchette's conversation with Mr. Bertram on November 28, 2000, he did not receive any further communication regarding Mr. Bertram until he received a call from the Attorney General's Office regarding a Habeas Corpus Petition that had been filed by Mr. Bertram and was soon to be scheduled for a hearing. Dr. Blanchette believes that he was

contacted regarding the pending Habeas Corpus Petition around the end of April, 2001. (Blanchette Affidavit, para. 13).

48.   Mr. Bertram had filed his original Habeas Petition in the Superior Court for the Hartford Judicial District on February 23, 2001.  He then filed an Amended Habeas Petition on or about April 26, 2001.  Dr. Blanchette was asked by the Attorney General's Office to review the Habeas Corpus Petition as well as Mr. Bertram's medical file in preparation for any hearing that may be held on the petition.  As noted in paragraph 4 above, Dr. Blanchette is often asked to consult with the Attorney General's Office on pending habeas matters that involve medical issues.  (Blanchette Affidavit, para. 14; Exhibits B and C to Blanchette Affidavit).

49.   In his Amended Habeas Petition, Mr. Bertram was asking the Court to order further evaluation and treatment regarding his degenerative back condition and asked the Court to enter an order that Dr. Blanchette personally oversee his case.  (Blanchette Affidavit, para. 15; Exhibit C to Blanchette Affidavit).

50.   After being notified by the Attorney General's Office of the pending habeas petition and upcoming hearing, Dr. Blanchette reviewed Mr. Bertram's medical file including the MRI of the lumbar spine that had been done on December 8, 2000.  Spinal stenosis is a condition that does place pressure on the spinal cord from disc bulging and does require monitoring. Dr. Blanchette felt that Mr. Bertram's condition would necessitate further neurological evaluation at some point in the future and may even require surgical intervention.  Surgery can be quite risky and does not always resolve the neurological issues associated with spinal stenosis. (Blanchette Affidavit, para. 16).

51.   After reviewing Mr. Bertram's medical records and particularly the results of the MRI of the lumbar spine, it was Dr. Blanchette's opinion that Mr. Bertram should be transferred back to his home state of Rhode Island.  (Blanchette Affidavit, para. 17).

52.   In the majority of cases where routine medical care is the norm, transfers under the Interstate Corrections Compact work well and serve an important function within the correctional system of relieving population pressures and providing an alternative placement for inmates who may be having problems in the sending state.  However, in those cases where an inmate in a receiving state develops a condition where non-routine medical care is likely to be required, maintaining the inmate in the receiving state is cumbersome and inefficient at best.  (Blanchette Affidavit, para. 18).

53.   As the Director of Clinical Services for DOC, Dr. Blanchette is often involved in facilitating the return of inmates to Connecticut who have developed a medical or mental health condition in the out-of-state placement that may require non-routine medical care.  Connecticut has hundreds of its inmates incarcerated in out-of-state placements and the return of inmates for medical/mental health reasons is a regular occurrence.  Having the inmate back in Connecticut removes a source of delay and allows for medical decisions to be based on direct observation.  Just as Dr. Blanchette is asked to help facilitate the return of inmates to Connecticut based on medical status, he is also asked to facilitate the return of inmates incarcerated in Connecticut to their sending states when their medical condition indicates it would be reasonable to do so.  (Blanchette Affidavit, para. 19).

54.   After reviewing Mr. Bertram's medical file, Dr. Blanchette informed the URC and the Attorney General's Office of his opinion that Mr. Bertram's spinal stenosis will likely require future non-routine evaluation and treatment and that his future needs could be addressed much

14

more easily and efficiently in his home state of Rhode Island without the extra level of review and approval necessitated by the interstate compact. There was general agreement that DOC should pursue his return to Rhode Island as soon as possible. (Blanchette Affidavit, para. 20).

55. On or about the first week of May, 2001, Dr. Blanchette spoke with the interstate compact administrators for Rhode Island and Connecticut and informed them of the desirability of returning Mr. Bertram to Rhode Island in view of his likely need for further evaluation and treatment of his back. At that point an understanding was reached that Mr. Bertram would be returning to Rhode Island as soon as his transfer could be arranged. Dr. Blanchette appeared before the Habeas Court on May 9, 2001 and explained that Connecticut DOC would be transferring Mr. Bertram back to Rhode Island where he could receive further evaluation and surgery if necessary. The Judge asked that Dr. Blanchette notify Rhode Island of recent MRI findings. (Blanchette Affidavit, para. 21; Exhibit D to Blanchette Affidavit).

56. Following the hearing on Mr. Bertram's Habeas Corpus Petition, Dr. Blanchette notified the Rhode Island DOC Health Services Director of the MRI results and suggested that Mr. Bertram might benefit from further neurological evaluation in Rhode Island to evaluate the appropriateness of surgical intervention. Mr. Bertram returned to Rhode Island on May 23, 2001. (Blanchette Affidavit, para. 22; Exhibit E to Blanchette Affidavit and Exhibit A to Silvis Affidavit).

57. When in Connecticut, Mr. Bertram's symptoms would fluctuate quite dramatically. This was demonstrated by the observations of many medical staff persons at the MCI infirmary as well as the observations of Dr. Silvis and Dr. Blanchette. When he signed himself out of the infirmary on December 19, 2000, Mr. Bertram was noted to be ambulating without difficulty. He was observed by Dr. Silvis on March 19, 2001 to be walking with and without his cane. At

the time when he again signed himself out of the MCI infirmary on May 10, 2001, Dr. Blanchette observed him to be walking with no noticeable ataxia.  (Blanchette Affidavit, para. 24; Exhibit F to Silvis Affidavit; Exhibit E to Blanchette Affidavit).

58.   While not directly involved in the decision to return Mr. Bertram to Rhode Island, both Dr. Silvis and Dr. Wolfson agree that it was a prudent and appropriate decision given his likely need for further evaluation and treatment and the delay and inefficiency inherent in the pre-approval process required for non-routine care.  (Wolfson Affidavit, para. 8; Silvis Affidavit, para. 45).

59.   Upon his arrival in Rhode Island, Mr. Bertram was observed to be ambulating with a cane and was noted to have a diagnosis of spinal stenosis, degenerative scoliosis and numbness in the extremities.  On June 7, 2001, he was noted to be doing quite well and was cleared for housing in the general population.  (Silvis Affidavit, para. 33; Exhibit V to Silvis Affidavit).

60.   Mr. Bertram was apparently put on a waiting list in Rhode Island for orthopedic and neurological consultations to take place at Rhode Island Hospital.  On November 5, 2001, he was informed by the Rhode Island DOC that he was scheduled for appointments with an orthopedic and neurology consultant.  (Silvis Affidavit, para. 34; Exhibit W to Silvis Affidavit).

61.   On November 16, 2001, Mr. Bertram was referred for MRIs of the lumbar and thoracic spine.  The MRI of the lumbar spine showed only mild degenerative disc disease at the L5/S1 level and an associated annulus tear in the area with no evidence of disc herniations or protrusions.  The MRI of the thoracic spine showed an elongated cystic area extending from the lower cervical spine down to the top of the T6 vertebrae.  The findings with respect to the lumbar spine were less serious than what might have been expected based on the earlier lumbar spine MRI done in December, 2000.  A follow-up MRI of the thoracic spine on December 11, 2001

showed a clearer view of an intradural cyst that was thought to be an arachnoid cyst.  (Silvis Affidavit, paras. 35-36; Exhibits X and Y to Silvis Affidavit).

62.    From the records recently obtained from Rhode Island medical providers, it appears as though Mr. Bertram's first visit with an outside consultant since his return to Rhode Island on May 23, 2001 occurred on January 31, 2002 with a Dr. James McLennan.  While Mr. Bertram's persistent headaches were the focus of much of the diagnostic testing in Connecticut, Mr. Bertram reported to Dr. McLennan that he was having no problem with his head or neck.  While he had been reasonably stable since his return to Rhode Island, Dr. McLennan noted that his spinal cord problems had been slowly getting worse over the past year.  Dr. McLennan recommended surgery to drain the cyst and relieve pressure from the spinal cord.   (Silvis Affidavit, para. 37; Exhibit Z to Silvis Affidavit).

63.    The level of spasticity and numbness noted by Dr. McLennan on January 31, 2002, was more advanced than what was seen by Dr. Wolfson when evaluating Mr. Bertram in October, 2000.  Similarly, Dr. Blanchette believes that Mr. Bertram's ataxia and spasticity had worsened considerably by January 31, 2002 compared to his observations in May, 2001. (Wolfson Affidavit, para. 10; Blanchette Affidavit, para. 28).

64.    Mr. Bertram underwent a thoracic laminectomy on February 12, 2001 at which time some spinal fluid was aspirated from the cyst.  (Silvis Affidavit, para. 38; Exhibit AA to Silvis Affidavit).

65.    Intradural spinal arachnoid cysts are a rare form of spinal lesion.  The Rhode Island physicians monitoring Mr. Bertram's progress submitted available test results to specialists at the University of Pennsylvania Medical Center for input regarding the etiology of Mr. Bertram's

condition and where to go with further treatment. (Silvis Affidavit, paras. 39-40; Exhibits BB and CC to Silvis Affidavit).

66.  On February 11, 2003, Mr. Bertram underwent further surgery to remove subarachnoid adhesions and to place a shunt in the subarachnoid space for drainage. On July 3, 2003, Mr. Bertram underwent a revision of the pleural shunt. (Silvis Affidavit, para. 41; Exhibit DD to Silvis Affidavit).

67.  During the course of a follow-up examination on October 23, 2003, the Rhode Island neurologist, Dr. J. Frederick Harrington, noted that Mr. Bertram's neurological picture had improved considerably. He was walking independently and had 5/5 strength in his lower extremities. On January 5, 2004, Dr. Harrington discharged Mr. Bertram from physical therapy. (Silvis Affidavit, paras. 42-43; Exhibits EE and FF to Silvis Affidavit).

68.  While in Connecticut, several measures were taken to address Mr. Bertram's complaints of headaches, back pain, leg weakness and numbness. Various medications were prescribed to treat his sinus problems and his headaches. Medications were also prescribed for his back pain. The staff at MCI had x-rays taken of his sinuses and lumbar spine. When he reported that his legs were getting rubbery, his headaches were getting worse and that he was experiencing some hesitancy upon urination, Dr. Silvis and Dr. Blanchette sent him to John Dempsey Hospital for further evaluation. At the hospital he was given an MRI of the head and received a neurological and ENT evaluation. As noted in the hospital discharge summary, there were no significant findings and no recommendation for any further neurological workup. Upon his return to MCI, Mr. Bertram was admitted to the infirmary as an inpatient to enable the medical staff to closely observe his condition. Dr. Silvis put in a request with URC for an MRI of the lumbar spine which was done on December 8, 2000. It showed evidence of disc bulging

and spinal stenosis.  Because patients with disc disease have good days and bad days, it was important to have an opportunity to observe Mr. Bertram over time to better understand the nature of his condition and any deterioration or improvement.  Instead of allowing the medical staff at MCI an opportunity to continuously monitor him, Mr. Bertram insisted on leaving the infirmary and returning to the general population.  When Dr. Silvis next saw Mr. Bertram in March, 2001, he noted some progression of his symptoms since December 19, 2000, however, he was not able to determine any stages of progression or fluctuation in symptoms because Mr. Bertram had not wanted to remain in the infirmary.  (Silvis Affidavit, para. 44).

69.    The MRI of December 8, 2000 revealed spinal stenosis.  Those results were consistent with the symptoms being reported by Mr. Bertram.  The finding of spinal stenosis became the focus in terms of assessing the likely need for subsequent follow-up evaluations and possible surgical intervention and it was the basis for the decision to transfer Mr. Bertram back to Rhode Island to facilitate follow-up evaluation and treatment.  At no time when Mr. Bertram was in Connecticut did any specialist recommend an MRI of the thoracic spine.  (Blanchette Affidavit, para. 29).

70.    Several months passed after his return to Rhode Island before Mr. Bertram was sent for any additional MRIs and/or any orthopedic/neurological evaluations.  Arachnoid cysts are quite rare and there is no mention in the Rhode Island medical records of the possibility of a thoracic arachnoid cyst prior to the MRI of the thoracic spine performed on November 16, 2001.  For whatever reason, there did not appear to be a sense of urgency among the Rhode Island medical professionals for follow-up tests or evaluations.    (Wolfson Affidavit, para. 14; Blanchette Affidavit, para. 30).

19

71.   The allegations of the Complaint pertaining to Warden Mark Strange are found in paragraphs 69-71, 126 and 143.

72.   Warden Strange does not recall receiving any written communication from Mr. Bertram regarding any health related issues.  A search of the correspondence files in the Warden's Office at MCI has not revealed any such written communication.  (Strange Affidavit, para. 4).

73.   Warden Strange does recall a habeas corpus petition filed by Mr. Bertram relating to his back since it was served on his office at MCI.  (Strange Affidavit, para. 5).

74.   Warden Strange does not recall any conversations with Mr. Bertram regarding health-related issues.  (Strange Affidavit, para. 5).

75.   If Mr. Bertram had stopped Warden Strange in the hall at MCI with a complaint regarding medical care, he would have checked with the medical staff to insure that they were aware of the medical complaint and that it was being addressed.  (Strange Affidavit, para. 6).

76.   In this case, if the medical staff had reported to Warden Strange that the URC and the Interstate Compact Office were awaiting Rhode Island's review of the medical issues and approval for further evaluation, he would have reported that to Mr. Bertram.  (Strange Affidavit, para. 6).

77.   The medical staff at MCI and the University of Connecticut Health Center make determinations as to whether a medical condition is such that it requires immediate emergency intervention or whether it can be handled on a non-emergency basis.  Warden Strange does not have the medical expertise to overrule the judgment of medical professionals when they tell him that they are addressing the inmate's medical complaint.  (Strange Affidavit, para. 7).

78.   On or about March 23, 2001, Mr. Bertram sent a letter to DOC Commissioner John Armstrong complaining that he was experiencing delays in getting tests and treatment for a back condition due to approvals required from the URC and the Rhode Island DOC.   (Tokarz Affidavit, para. 3; Exhibit A to Tokarz Affidavit).

79.   Upon receipt of Mr. Bertram's letter of March 23, 2001, Commissioner Armstrong asked if Deputy Commissioner Tokarz would check into Mr. Bertram's complaint and the status of DOC's response to the complaint and then prepare a reply to Mr. Bertram.  (Tokarz Affidavit, para. 4).

80.   Deputy Commissioner Tokarz learned that Dr. Silvis had recently seen Mr. Bertram and had provided URC with an updated report on Mr. Bertram's back condition.  He also learned that this updated information had been forwarded to Rhode Island for their review and decision as to whether or not they would approve further evaluation.  Deputy Commissioner Tokarz then informed Mr. Bertram by letter dated April 6, 2001 of the information he had learned.  (Tokarz Affidavit, para. 5; Exhibit B to Tokarz Affidavit).

81.   After replying to Mr. Bertram's letter, Deputy Commissioner Tokarz does not recall receiving any further communication regarding Mr. Bertram.  (Tokarz Affidavit, para. 6).

82.   Deputy Commissioner Tokarz has no medical expertise and would routinely rely upon the information provided to him by the DOC medical staff in response to inmate medical complaints that were forwarded to him or the Commissioner.  In this case, it seemed reasonable that Mr. Bertram's back problem was deemed non-routine and that prior approval from Rhode Island was needed for any subsequent evaluations or treatments.  (Tokarz Affidavit, para. 8).

83.   As the Deputy Commissioner for Programs and Treatment for several years, Mr. Tokarz was familiar with the need to return inmates to the sending state for evaluation and

treatment of non-routine conditions.  In his opinion, the decision to return Mr. Bertram to Rhode

Island was reasonable under the circumstances.  (Tokarz Affidavit, paras. 7-8).


DEFENDANTS
John Armstrong, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:    _____/s/_____

Richard T. Couture
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct05480
E-Mail:  richard.couture@po.state.ct.us
Tel.: (860) 808-5450
Fax: (860) 808-5591


## CERTIFICATION

I hereby certify that a copy of the foregoing Local Rule 56(a)1 Statement was mailed on

this 27th day of May, 2004, to:

Frank Allen Bertram, No. 74523
Adult Correctional Institution
Medium Security 1
P.O. Box 8274
Cranston, RI  02920


_____/s/_____
Richard T. Couture
Assistant Attorney General