UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| FRANK ALLEN BERTRAM | : | PRISONER<br>CIVIL NO. 3:02CV1613 (AVC)(TPS) |
| v. | : |  |
| JOHN ARMSTRONG, ET AL. | : | MAY 27, 2004 |

### AFFIDAVIT OF EDWARD BLANCHETTE, M.D., IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Edward Blanchette, M.D., being first duly sworn, deposes and says:

1. I am a physician licensed to practice Medicine in the State of Connecticut since 1975.

2. I am Board Certified in Internal Medicine and Infectious Disease.

3. I have held various positions with the Connecticut Department of Correction ("DOC") since 1984 including Hospital Clinical Director at the Osborn Correctional Institution, Medical Director at the MacDougall Correctional Institution and Acting Director of DOC Health Services.

4. I am currently the Director of Clinical Services for the DOC and have held this position since 1996. My duties as Director of Clinical Services include consultation with Correctional Managed Health Care staff when requested, screening requests for emergency room admissions, facilitating the interstate transfers of inmates where medical issues are involved, and review and consultation with the Attorney General's Office with respect to medical Habeas Corpus petitions.

5. In addition to my duties as Director of Clinical Services for DOC, I also conduct Infectious Disease Clinics ("I.D. Clinics") at the MacDougall Correctional Institution ("MCI")

and the Bridgeport Correctional Center. The Infectious Disease Clinics at MCI are conducted on the average of two to three times per week.

6. I am not a primary care physician at MCI or any other correctional facility. My direct care responsibilities are limited to the I.D. Clinics which I conduct at Bridgeport Correctional Center and MCI.

7. I have reviewed the Complaint that was filed by Mr. Frank Bertram in this matter and noted that the only paragraphs of the Complaint which contain any factual assertions relating to me are paragraphs 25, 48, 49, 50 and 135. I will discuss these paragraphs in order.

8. In paragraph 25 of the Complaint, Mr. Bertram asserts that on October 26, 2000, Dr. Timothy Silvis and I agreed that Mr. Bertram's symptoms warranted immediate action. As noted in paragraph 4 above, one of my responsibilities as Director of Clinical Services is to screen requests for emergency room admissions. I received a call from Dr. Silvis on October 26, 2000 indicating that Mr. Bertram had been having headaches which had gotten much worse. He had been nauseous due to the severity of the headaches and his lower extremities had become weak. See para. 12 of Silvis Affidavit and Exhibit F attached thereto. Based on the severity of the headaches as described to me, I approved an admission to the emergency room for Mr. Bertram where they could assess for the presence of any brain lesion. Whenever I authorize an emergency room admission, I always receive a verbal summary of the results of the visit. In Mr. Bertram's case, I was informed that no lesions were found, there was no recommendation for any neurological follow-up visits and that the headache had pretty much resolved at the time of discharge on October 27, 2000.

9. Following his visit to the John Dempsey Hospital on October 26-27, 2000, I had no further contact with anyone regarding Mr. Bertram until November 28, 2000 when Mr. Bertram

2

stopped me in the hall of the MCI medical unit. I was at MCI that day conducting an Infectious Disease Clinic when he stopped me in the hall. His description of this encounter in paragraphs 48-50 of his Complaint is incomplete and somewhat inaccurate. Although I do not recall ever having met Mr. Bertram prior to November 28, 2000, it is my impression that he knew who I was and I believe he called me by my name. He mentioned his visit to the John Dempsey Hospital emergency room on October 26, 2000 which I had authorized and proceeded to describe the emergency room physician as a quack. He expressed dissatisfaction with his emergency room visit and left the impression that he was never seen or evaluated by anyone at the hospital.

10. Following my initial encounter with Mr. Bertram on November 28, 2000, I was concerned over his accusations in that it ran counter to my years of experience with John Dempsey Hospital emergency room visits where evaluations are usually conducted regarding patient complaints. I told him I would pull his medical file which was located in the MCI medical unit and review it. After pulling his file, I noted that he had been admitted to the hospital, remained overnight, received an MRI of the head and received evaluations by an ENT consultant and a neurologist. I pointed out to Mr. Bertram that he appeared to be given appropriate tests and evaluations while at the hospital contrary to what he had told me a few minutes earlier. We may well have discussed the fact that the neurologist found inconsistencies between the symptoms reported by Mr. Bertram and the results of neurological testing. The neurologist who saw Mr. Bertram was Leslie Wolfson, M.D. He is the Chief of Neurology at John Dempsey Hospital and very well respected in the field. I was comfortable in my belief that Mr. Bertram received a thorough neurological evaluation.

11. In his concluding remarks in paragraph 50 of the Complaint, Mr. Bertram asserts that I told him there were "tests to check his physical complaints" but nothing was done and

there was "no physical exam." As noted earlier, I was at MCI conducting an Infectious Disease Clinic. I do not provide primary care to inmates at MCI except in the context of the Infectious Disease Clinics. I did take time out to review his file and try to answer his questions—not to give him a physical exam. I noted in his file that he would soon be going to John Dempsey Hospital for an MRI of the lumbar spine although I could not tell him the exact date for security reasons. In view of all that had been done prior to November 28, 2000 and the upcoming MRI of the lumbar spine, his statement that nothing was being done is absolutely false.

12. The only other factual assertion which I could find in the Complaint which mentioned my name was found in paragraph 135 where Mr. Bertram states that he wrote to me and Nurse Elaine Lucas on April 25, 2001 complaining of numbness and difficulty urinating. A search of applicable records has not revealed any such correspondence. Mr. Bertram did send a inmate request form to the MCI medical unit on April 25, 2001 with similar complaints. The response section of the inmate request form indicates that it was received by Elaine Lukas and then endorsed by Dr. Silvis who saw Mr. Bertram on April 30, 2001 as reflected in the chart entry which is part of Exhibit F to the affidavit of Dr. Silvis. <u>See</u> inmate request form attached hereto as Exhibit A. I was not aware of any inmate request form from Mr. Bertram as I was not assigned to direct care at MCI except for the infectious disease patients who I see in the clinic.

13. Following my conversation with Mr. Bertram on November 28, 2000, I did not receive any further communication regarding Mr. Bertram until I received a call from the Attorney General's Office regarding a Habeas Corpus Petition that had been filed by Mr. Bertram and was soon to be scheduled for a hearing. I believe that I was contacted regarding the pending Habeas Corpus Petition around the end of April, 2001.

14. Mr. Bertram had filed his original Habeas Petition in the Superior Court for the Hartford Judicial District on February 23, 2001. <u>See</u> original Habeas Corpus Petition attached hereto as Exhibit B. He then filed an Amended Habeas Petition on or about April 26, 2001. <u>See</u> Amended Habeas Petition attached hereto as Exhibit C. I was asked by the Attorney General's Office to review the Habeas Corpus Petition as well as Mr. Bertram's medical file in preparation for any hearing that may be held on the petition. As noted in paragraph 4 above, I am often asked to consult with the Attorney General's Office on pending habeas matters that involve medical issues.

15. In his Amended Habeas Petition, Mr. Bertram was asking the Court to order further evaluation and treatment regarding his degenerative back condition and asked the Court to enter an order that I personally oversee his case. <u>See</u> attached Exhibit C.

16. After being notified by the Attorney General's Office of the pending habeas petition and upcoming hearing, I reviewed Mr. Bertram's medical file including the MRI of the lumbar spine that had been done on December 8, 2000. Spinal stenosis is a condition that does place pressure on the spinal cord from disc bulging and does require monitoring. I felt that Mr. Bertram's condition would necessitate further neurological evaluation at some point in the future and may even require surgical intervention. Surgery can be quite risky and does not always resolve the neurological issues associated with spinal stenosis.

17. After reviewing Mr. Bertram's medical records and particularly the results of the MRI of the lumbar spine, it was my opinion that Mr. Bertram should be transferred back to his home state of Rhode Island.

18. As noted in paragraph 5 and Exhibit D to the Affidavit of Dr. Silvis, a receiving state must receive advance authority in writing from the sending state before incurring non-

routine medical expenses except in the case of an emergency. In the majority of cases where routine medical care is the norm, transfers under the interstate corrections compact work well and serve an important function within the correctional system of relieving population pressures and providing an alternative placement for inmates who may be having problems in the sending state. However, in those cases where an inmate in a receiving state develops a condition where non-routine medical care is likely to be required, maintaining the inmate in the receiving state is cumbersome and inefficient at best.

19. As the Director of Clinical Services for DOC, I am often involved in facilitating the return of inmates to Connecticut who have developed a medical or mental health condition in the out-of-state placement that may require non-routine medical care. Connecticut has hundreds of its inmates incarcerated in out-of-state placements and the return of inmates for medical/mental health reasons is a regular occurrence. Having the inmate back in Connecticut removes a source of delay and allows for medical decisions to be based on direct observation. Just as I am asked to help facilitate the return of inmates to Connecticut based on medical status, I am also asked to facilitate the return of inmates incarcerated in Connecticut to their sending states when their medical condition indicates it would be reasonable to do so.

20. After reviewing Mr. Bertram's medical file, I informed the Correctional Managed Health Care Program's Utilization Review Committee ("URC") and the Attorney General's Office of my opinion that Mr. Bertram's spinal stenosis will likely require future non-routine evaluation and treatment and that his future needs could be addressed much more easily and efficiently in his home state of Rhode Island without the extra level of review and approval necessitated by the interstate compact. There was general agreement that we should pursue his return to Rhode Island as soon as possible.

21. On or about the first week of May, 2001, I spoke with the interstate compact administrators for Rhode Island and Connecticut and informed them of the desirability of returning Mr. Bertram to Rhode Island in view of his likely need for further evaluation and treatment of his back. At that point we reached an understanding that Mr. Bertram would be returning to Rhode Island as soon as his transfer could be arranged. I appeared before the Habeas Court on May 9, 2001 and explained that we would be transferring Mr. Bertram back to Rhode Island where he could receive further evaluation and surgery if necessary. The Judge asked that I notify Rhode Island of recent MRI findings. <u>See</u> notification of hearing and final order attached hereto as Exhibit D.

22. Following the hearing on Mr. Bertram's Habeas Corpus Petition, I notified the Rhode Island DOC Health Services Director of the MRI results and suggested that Mr. Bertram might benefit from further neurological evaluation in Rhode Island to evaluate the appropriateness of surgical intervention. <u>See</u> letter attached hereto as Exhibit E. Mr. Bertram returned to Rhode Island on May 23, 2001. <u>See</u> Exhibit A to the Affidavit of Dr. Silvis.

23. I have reviewed Mr. Bertram's medical records from the Connecticut DOC as well as some records which the Attorney General's Office recently obtained from the Rhode Island DOC and various medical providers in Rhode Island. The affidavit of Dr. Silvis which is being filed herewith contains a summary of medical contacts relating to Mr. Bertram both in Connecticut and Rhode Island and I will not restate them here.

24. Mr. Bertram's symptoms would fluctuate quite dramatically. This is clear from the numerous observations cited in the medical records as well as my own observations. When Mr. Bertram signed himself out of the MCI infirmary on December 19, 2000 he was noted to be ambulating without difficulty. <u>See</u> Exhibit F to Affidavit of Dr. Silvis. He later reported having

some progression with increased numbness and leg weakness. He was observed by Dr. Silvis on March 19, 2001 to be walking with and without his cane. After being admitted again to the MCI infirmary on April 30, 2001, he signed out against advice on May 10, 2001. I observed Mr. Bertram at MCI during one of my clinic visits there at about the time that he was signing out of the medical unit on May 10, 2001, and I observed him to be walking with no noticeable ataxia. See attached Exhibit E.

25. Notwithstanding the inconsistencies noted in his neurological evaluation of October 26, 2000 and the wide fluctuation in his reported and observed symptoms, the MRI of December 8, 2000 clearly showed that Mr. Bertram had a problem with the lumbar spine that would require future monitoring, evaluation and possible surgical intervention. His symptoms in Connecticut were consistent with a diagnosis of spinal stenosis.

26. As noted in the affidavit of Dr. Silvis and the exhibits attached thereto, upon his return to Rhode Island, Mr. Bertram was noted to have a diagnosis of spinal stenosis. He was noted to be ambulating with a cane and to be experiencing numbness to his lower extremities. See Exhibit V to affidavit of Dr. Silvis. Notwithstanding these observations and my letter to the Rhode Island Health Services Director suggesting the advisability of a follow-up neurosurgical evaluation, apparently the medical professionals in Rhode Island did not feel that there was any urgency to such an evaluation based on their observations and assessments of his condition. I note also that he was placed in the general population in Rhode Island while the staff at MCI had tried to convince him to remain in the infirmary for closer observation. See Exhibits V and W to the Affidavit of Dr. Silvis.

27. On November 16, 2001, an MRI of the thoracic spine detected a cystic area in the upper thoracic spine which was believed to be an arachnoid cyst. Mr. Bertram had surgery on

February 12, 2002 to try to relieve pressure caused by the cyst.  See Exhibits Y and AA to affidavit of Dr. Silvis.

28.     Dr. James McLennan saw Mr. Bertram on January 31, 2002 and noted that Mr. Bertram's spinal cord problem had been slowly getting worse over the past year.  Based on my personal observations on May 10, 2001 of the absence of any noticeable ataxia at that time, I would have to concur with Dr. McLennan that Mr. Bertram's ataxia and spasticity had worsened by January 31, 2002.  See Exhibit Z to Affidavit of Dr. Silvis.

29.     While in Connecticut, Mr. Bertram received regular treatment for his headaches and a variety of diagnostic evaluations and tests for his other symptoms in a relatively short period of time as summarized in paragraph 44 of the affidavit of Dr. Silvis and exhibits attached thereto. The neurological evaluation conducted on October 26, 2000 did not note any specific neurological deficits and did not recommend any further neurological follow-up. Notwithstanding the negative neurological findings, Dr. Silvis did request URC approval for an MRI of the lumbar spine to get an objective assessment of the lower extremities in view of Mr. Bertram's unsteady gait.  The MRI of December 8, 2000 revealed spinal stenosis due to bulging discs.  These results were consistent with the symptoms reported by Mr. Bertram.  In terms of assessing the likely need for subsequent follow-up evaluations and possible surgical intervention, the findings of spinal stenosis became the focus of attention and the basis for the decision to transfer Mr. Bertram back to Rhode Island for follow-up evaluation and treatment. At no time did anyone recommend an MRI of the thoracic spine.  If during the neurological consultation at the John Dempsey Hospital there was noted to be some indication for doing an MRI of the thoracic spine, there would have been a recommendation to that effect.  Dr. Silvis did all that could reasonably be expected given the results of the specialist consultations, the

fluctuation in symptoms, the need for prior approval and the refusal of the patient to remain in the medical unit for observation.

30. Upon his return to Rhode Island, the medical staff at the Rhode Island DOC apparently observed no signs or symptoms that indicated to them an urgent need for MRIs of the thoracic or lumbar spine. No MRIs were conducted in Rhode Island until November, 2001. The absence of any recommendation for an MRI of the thoracic spine could be explained because of the rarity of thoracic spinal arachnoid cysts. It is not that rare for bulging discs to cause spinal cord compression which is what was thought to be the cause of Mr. Bertram's numbness and unsteadiness. Intradural arachnoid cysts, on the other hand, are quite rare.

I, Edward Blanchette, M.D., do hereby swear that the contents of the foregoing affidavit are true and accurate to the best of my knowledge and belief.

_____/s/_____
Edward Blanchette, M.D.

Subscribed and sworn to, before me, this  21st  day of May, 2004.

_____/s/_____
Richard T. Couture
Commissioner of the Superior Court

10

                                            DEFENDANTS
                                            John Armstrong, et al.

                                            RICHARD BLUMENTHAL
                                            ATTORNEY GENERAL

BY:        /s/
              Richard T. Couture
              Assistant Attorney General
              110 Sherman Street
              Hartford, CT  06105
              Federal Bar #ct05480
              E-Mail:  richard.couture@po.state.ct.us
              Tel.: (860) 808-5450
              Fax: (860) 808-5591

## **CERTIFICATION**

I hereby certify that a copy of the foregoing Affidavit of Edward Blanchette, M.D., with attached exhibits, was sent by first class mail, postage prepaid, this 27th day of May, 2004, to:

Frank Allen Bertram, No. 74523
Adult Correctional Institution
Medium Security 1
P.O. Box 8274
Cranston, RI  02920

                                                                    /s/
                                                      Richard T. Couture
                                                      Assistant Attorney General