## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| FRANK ALLEN BERTRAM | : | PRISONER<br>CIVIL NO. 3:02CV1613 (AVC)(TPS) |
| v. | : |  |
| JOHN ARMSTRONG, ET AL. | : | MAY 27, 2004 |

## AFFIDAVIT OF TIMOTHY SILVIS, M.D., IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Timothy Silvis, M.D., being first duly sworn, deposes and says:

1. I am a physician licensed to practice Medicine in the State of Connecticut since 1983.

2. I am Board Certified in Internal Medicine.

3. I was employed part-time at the Osborn Correctional Institution from 1989 to 1995 and part-time at the MacDougall Correctional Institution ("MCI") from 1995 to 1997. I have been employed full-time at MCI since April, 1997.

4. Mr. Frank Bertram was transferred to Connecticut from Rhode Island pursuant to the Interstate Corrections Compact on October 11, 1991. See Movement Sheet (RT 60) attached hereto as Exhibit A. He went back to Rhode Island on December 6, 1991 and then returned to Connecticut on December 31, 1991. See memo from Amaral to DiNetto dated 12-23-91 attached hereto as Exhibit B. Mr. Bertram remained in the custody of the Connecticut Department of Correction ("DOC") from December 30, 1991 to May 23, 2001, at which time he returned to the custody of the Rhode Island Department of Correction. See Exhibit A and letter from DiNetto to Milling dated 5-17-01 attached hereto as Exhibit C.

5. Under the terms of the Interstate Compact Agreement with the State of Rhode Island, except in the case of an emergency, the receiving state must receive advance authority in writing from the sending state before incurring medical expenses for diagnostic and treatment services that are considered beyond the scope of routine health services provided by the correctional medical staff. <u>See</u> Interstate Corrections Compact Agreement attached hereto as Exhibit D.

6. I saw Mr. Bertram at the MCI infirmary on April 20, 2000 concerning his Hepatitis C and headaches he had been having for a few weeks. Sinus x-rays that had been taken on March 28, 2000 had shown that Mr. Bertram had mild left maxillary sinusitis. <u>See</u> x-ray report attached hereto as Exhibit E. At that time, I prescribed an antihistamine and a nasal spray. <u>See</u> clinical record and physician orders attached hereto as Exhibits F and G.

7. On July 6, 2000, Mr. Bertram told me that the antihistamine had not helped his headaches. He also complained of chronic back pain. I prescribed some different medications for his sinuses as well as Motrin for pain. I also ordered an x-ray of the lumbar spine and an additional sinus x-ray. <u>See</u> Exhibits F and G.

8. The x-rays of the lumbar spine and sinuses taken on July 13, 2000 revealed some degenerative changes of the lumbar spine and mild mucosal thickening of the left maxillary sinus most likely related to chronic sinusitis. <u>See</u> x-ray report of 7-13-00 attached hereto as Exhibit H.

9. I next saw Mr. Bertram on August 21, 2000, at which time he complained of back spasms. He had fair range of motion with no body tenderness in the vertebral area. I discussed with him the degenerative changes noted on the lumbar spine x-rays and changed his medication

to Anaprox since he reported that the Motrin was not helping.  I also advised Mr. Bertram not to engage in sports or weight lifting.  See Exhibits F and G.

10. On October 16, 2000, Mr. Bertram informed the nursing staff that his headaches were back and his legs were weak.  He asked that he be given some more Erythromycin and Motrin as they seemed to help with the headaches.  I entered an order for a continuation of these medications on October 20, 2000.  See Exhibits F and G.

11. Mr. Bertram returned to the MCI infirmary on October 25, 2000.  He reported to me at that time that his legs were weak and that he had some hesitation when urinating.  There was marked ataxia of the lower extremities, poor heel-to-toe gait.  See Exhibits F and G.  I was concerned that Mr. Bertram may have a neurologic lesion so I sent in a request to the Utilization Review Committee of the Correctional Managed Health Care Program for an MRI of the head.  See attached Exhibit I.

12. While monitoring Mr. Bertram in the MCI medical unit on October 26, 2000, he began to report a terrible headache with nausea.  I called Dr. Edward Blanchette, the Director of Clinical Services for DOC, and he agreed that we should send Mr. Bertram to the University of Connecticut Health Center ("UCHC").  See Exhibit F.

13. Mr. Bertram was admitted to John Dempsey Hospital at UCHC on October 26, 2000 and remained until the next day.  While at the hospital, he was evaluated by Neurology and ENT specialists and underwent an MRI of the head.  The results of these evaluations and tests are set forth in the Discharge Summary, MRI report and consultation reports attached hereto as Exhibit J.

14. The neurological findings were inconsistent with some of the conditions reported by Mr. Bertram. He was noted to have a negative Babinski, negative Rhomberg, 5 of 5 strength in lower extremities and positive sensation to light touch and pin touch in the extremities. The objective neurological evaluation was quite normal and no further neurological workup was felt to be necessary. See Exhibit J.

15. The MRI of the head showed no lesions. There was a small acoustic neuroma in the auditory canal and mild chronic sinusitis which was not felt to be causing the headache. See Exhibit J.

16. Upon discharge from John Dempsey Hospital, Mr. Bertram was noted to have no further complaints of headaches and no neck stiffness. His condition was deemed stable. See Exhibit J.

17. Upon his return to MCI on October 27, 2000, Mr. Bertram was admitted to the facility infirmary for continued observation. When I saw him on October 30, 2000, he reported difficulty with urination. At that time I ordered some urine tests which came back negative. See test results attached hereto as Exhibit K. Since the MRI of the head that was done at John Dempsey Hospital showed no significant findings, I sent in a request to the Utilization Review Committee ("URC") for an MRI of the lumbar spine to further assess the lower extremities. This request was forwarded to the Rhode Island DOC. Verbal approval from Rhode Island was received on November 22, 2000. The MRI was scheduled for December 8, 2000. See URC request and approval attached hereto as Exhibit L.

18. The MRI of the lumbar spine conducted on December 8, 2000 showed spinal stenosis as set forth in the MRI report attached hereto as Exhibit M. Spinal stenosis is a

degenerative disease characterized by narrowing of space in the spine. In Mr. Bertram's case, the loss of space was caused primarily by the bulging of some of the discs.

19. While surgical intervention in the form of a laminectomy is one form of treatment for spinal stenosis, it is seldom recommended without allowing for a period of further observation and evaluation. Recognizing that surgery might be an option at some point in the future, I forwarded a request for a neurosurgical evaluation and opinion on December 13, 2000. See URC request attached hereto as Exhibit N.

20. Throughout his stay in the MCI infirmary, Mr. Bertram was noted by several different medical staff persons to be walking with what appeared to be exaggerated movements. On some occasions he would be seen to be walking with a steady gait in a very normal fashion while on other occasions he would be quite unsteady. On December 4, 2000, I noted that his hyperflexion had improved significantly. The inconsistency of Mr. Bertram's presentation made clinical assessment difficult at best. See Exhibit F.

21. As difficult as it was to get a true assessment of Mr. Bertram's condition when he was in the infirmary, his decision to leave the infirmary on December 19, 2000 made it impossible to chart any day-to-day progress or deterioration. Nevertheless, I did not order Mr. Bertram to remain in the infirmary as he made it clear that he wished to be discharged to population and he was ambulating very easily with practically no symptoms of unsteady gait or hyperflexion at the time of discharge. See Exhibit F.

22. Following his discharge from the MCI infirmary on December 19, 2000, I did not receive any further communication from Mr. Bertram or about Mr. Bertram until February 2, 2001 when I was contacted by the UCHC Utilization Review Committee which had noted that

5

Mr. Bertram appeared to be doing much better in December, 2000. They had questions as to whether they should pursue approval from the Rhode Island DOC regarding a further neurological workup regarding the earlier MRI findings of spinal stenosis in view of the improved condition. See URC report attached hereto as Exhibit O. I noted at that time that I would have to see Mr. Bertram again in the medical unit to update the URC on his condition. See Exhibit F.

23. Thereafter Mr. Bertram was seen on the medical unit by the MCI nursing staff who noted that he was complaining of increased numbness and inquiring about the status of a follow-up neurological consultation. See Exhibit F.

24. Mr. Bertram was then placed on the M.D. sick call list and was seen by me on March 19, 2001. At that time I noted that he was sometimes walking with a quad cane and sometimes without the cane. I further noted that his reported ambulation and loss of sensation issues were not resolving. See Exhibit F.

25. On March 23, 2001 I forwarded to the URC a follow-up request for a neurological consultation noting my observations of March 19, 2001. It is my understanding that the URC, through the Connecticut Interstate Compact Office, provided the Rhode Island DOC with my updated assessment to assist them in deciding whether to approve a referral for further neurological evaluation. See URC request and follow-up correspondence attached hereto as Exhibit P.

26. At or about the time that I had sent a follow-up assessment and request to the URC, Mr. Bertram was writing letters to Connecticut and Rhode Island correctional officials complaining about difficulties in obtaining follow-up diagnosis and treatment for his

degenerative back condition. <u>See</u> letters dated 3/23/01 and 4/2/01 and responses thereto attached hereto as Exhibit Q. I was also informed that Mr. Bertram had filed a habeas corpus petition in the Connecticut Superior Court complaining about delays in diagnosis and treatment.

27. At the time that Mr. Bertram was corresponding with officials regarding his requests for follow-up evaluation and treatment, Rhode Island correctional and medical staff were reviewing the request for neurological follow-up. <u>See</u> memos from Rhode Island officials attached hereto as Exhibit R.

28. On April 30, 2001, Mr. Bertram reported worsening symptoms relating to his instability. He refused my request that he be admitted to the MCI infirmary. I insisted at this point that he remain in the infirmary for his own safety. <u>See</u> Exhibit F.

29. When I saw Mr. Bertram on May 9, 2000, I noted that he was ambulating around the infirmary quite easily with his quad cane. <u>See</u> Exhibit F.

30. In view of the likely need for continued consultations, assessments and possible surgery related to his back condition, the decision was made that Mr. Bertram should be returned to Rhode Island. While the Rhode Island DOC did eventually approve a follow-up neurosurgical evaluation on April 18, 2001, (<u>see</u> attached Exhibit S), the pre-approval process was felt to be too cumbersome in a case where it was felt that the inmate would require continuing non-routine medical care and evaluation.

31. On May 10, 2001, Mr. Bertram signed himself out of the MCI infirmary. <u>See</u> refusal form attached hereto as Exhibit T. I did not see him again.

32. Dr. Edward Blanchette, Director of Clinical Services for DOC, sent a brief summary of Mr. Bertram's medical issues to the Director of Health Services for the Rhode Island

DOC. See attached Exhibit U. Mr. Bertram returned to Rhode Island on May 23, 2001. See Exhibit A.

33. I recently had an opportunity to review some medical records from Rhode Island which were apparently obtained through discovery in this case. I note that upon his arrival in Rhode Island, he was observed to be ambulating with a cane with a diagnosis of spinal stenosis, degenerative scoliosis and numbness in the extremities. On June 7, 2001 he was noted to be doing quite well and cleared for housing in the general population. See attached Exhibit V.

34. Mr. Bertram was apparently put on a waiting list for an orthopedic consultation at Rhode Island Hospital. On November 5, 2001 he was informed by Rhode Island DOC that he was scheduled for appointments with an orthopedic and neurology consultant. See memos of 7/30/01 and 11/5/01 attached hereto as Exhibit W.

35. On November 16, 2001, Mr. Bertram was referred for MRIs of the lumbar and thoracic spine. The MRI of the lumbar spine showed only mild degenerative disc disease at the L5/S1 level and an associated annulus tear in the area with no evidence of disc herniations or protrusions. The MRI of the thoracic spine showed an elongated cystic area extending from the lower cervical spine down to the top of the T6 vertebrae. See MRI results attached hereto as Exhibit X. The findings with respect to the lumbar spine were less serious than what might have been expected based on the earlier lumbar spine MRI done in December, 2000. See Exhibit M. The MRI of the thoracic spine, however, revealed a cyst that apparently had not been included in anyone's earlier differential diagnosis.

36. A follow-up MRI of the thoracic spine on December 11, 2001 showed a clearer view of an intradural cyst that was thought to be an arachnoid cyst. See MRI report dated 12/11/01 attached hereto as Exhibit Y.

37. To the best of my knowledge, Mr. Bertram's first visit with an outside consultant since his return to Rhode Island occurred on January 31, 2002. At that time he reported that he was having no problem with his head or neck. In contrast, during the latter part of 2000, his persistent headaches were the focus of many of his complaints and the focus of the diagnostic efforts of the medical staff at MCI and John Dempsey Hospital. The consultant, Dr. James McLennan, noted that while he had been reasonably stable, his spinal cord problems had been slowly getting worse over the past year. The small internal auditory canal lesion that was noted during his stay at the John Dempsey Hospital on October 27, 2000 (Exhibit J) was not found in the films taken in Rhode Island. Dr. McLennan recommended surgery to drain the cyst and relieve some pressure from the spinal cord. See Report of Dr. James McLennan attached hereto as Exhibit Z.

38. Mr. Bertram underwent surgery in February, 2002 to remove spinal fluid from the cyst. See discharge summary attached hereto as Exhibit AA.

39. Intradural spinal arachnoid cysts are a rare form of spinal lesion. At one point in 2002, the Rhode Island physicians monitoring Mr. Bertram's progress submitted available test results to specialists at the University of Pennsylvania Medical Center for input regarding the etiology of Mr. Bertram's condition. See Report from Miriam Hospital dated 8/27/02 attached hereto as Exhibit BB.

40. On September 18, 2002, Dr. McLennan visited Mr. Bertram during a physical therapy session. At that time he noted that he too had been in contact with specialists from the University of Pennsylvania Medical Center since they were still up in the air as to the etiology of Mr. Bertram's condition and where to go with further treatment. See Report of Dr. McLennan attached as Exhibit CC.

41. On February 11, 2003, Mr. Bertram underwent surgery in an effort to de-tether the spinal cord from additional adhesions of unknown origin. Shunt tubing was also put into place in the subarachnoid space. On July 3, 2003, Mr. Bertram underwent a revision of the cyst pleural shunt. See surgical summaries attached hereto as Exhibit DD. The surgeries were performed by Dr. J. Frederick Harrington.

42. During the course of a follow-up exam on October 23, 2003, Dr. Harrington noted that Mr. Bertram's neurological picture had improved considerably. He was walking independently and had 5/5 strength in his lower extremities. The report was very positive and upbeat. See Report of Dr. Harrington dated 10/23/03 attached hereto as Exhibit EE.

43. On January 5, 2004, Dr. Harrington discharged Mr. Bertram from physical therapy. See note from Dr. Harrington attached hereto as Exhibit FF.

44. When Mr. Bertram was complaining of headaches and back pain at MCI, we took several measures to try to address his complaints. We prescribed different medications to treat his sinus problems and headaches. We prescribed medications for his back pain. We took x-rays of his sinuses and lumbar spine. When he reported that his legs were getting rubbery, his headaches were getting worse and some hesitancy upon urination, we transferred him to John Dempsey Hospital for further evaluation. At the hospital he was given an MRI of the head and a

full neurological and ENT evaluation. Following all of the various tests and evaluations, there were no significant findings and no recommendations for any further neurological workup. Upon his return to MCI, we admitted him as an inpatient in the infirmary to enable us to closely monitor his condition. Because of his dissatisfaction with the evaluations at the hospital, I put in a URC request for an MRI of his lumbar spine. The MRI was done on December 8, 2000 and showed evidence of spinal stenosis. Patients with disc disease have good days and bad days. It is important to have an opportunity to continuously observe them over time to better understand the true nature of their condition and any deterioration or improvement. Instead of allowing us to do this, Mr. Bertram insisted on leaving the infirmary and returning to the general population. I did not see him again until March, 2001. While I noted at that time some apparent progression and worsening of his symptoms since December 19, 2001, it was difficult to determine the nature and course of progression since he did not want to remain in the infirmary where these could have been regularly monitored.

45. Although I was not directly involved in the decision to return Mr. Bertram to Rhode Island, I did feel that Mr. Bertram would be in need of further non-routine evaluation and treatment and that his return to Rhode Island would certainly eliminate the inefficiency, delay and uncertainty which is inherent in the pre-approval process. It is also far more desirable for the ultimate decision makers—in this case the Rhode Island medical professionals—to make diagnostic and treatment decisions based on direct observation rather than reports filed by medical professionals in another state.

46. After his return to Rhode Island DOC on May 23, 2001, it is apparent from the records I reviewed that no further diagnostic procedures were conducted until November, 2001.

He was not evaluated by an orthopedic specialist until January, 2002. The discovery of a arachnoid cyst in the thoracic spine was unexpected. The specialists in Rhode Island seemed somewhat puzzled as to its etiology and as to how the condition might progress. It was clearly noted in the records that Mr. Bertram's ataxia and ambulation problems had progressively worsened during 2001. While I am not in a position to draw any conclusions as to the course of events in Rhode Island, we clearly provided much more intensive observation, diagnostic testing and treatment during Mr. Bertram's final months in Connecticut than was provided during his first seven months in Rhode Island.

I, Timothy Silvis, M.D., do hereby swear that the contents of the foregoing affidavit are true and accurate to the best of my knowledge and belief.

_____/s/_____
Timothy Silvis, M.D.

Subscribed and sworn to, before me, this _21st_ day of May, 2004.

_____/s/_____
Richard T. Couture
Commissioner of the Superior Court

              DEFENDANTS
              John Armstrong, et al.

              RICHARD BLUMENTHAL
              ATTORNEY GENERAL


BY:   /s/_____
    Richard T. Couture
    Assistant Attorney General
    110 Sherman Street
    Hartford, CT  06105
    Federal Bar #ct05480
    E-Mail:  richard.couture@po.state.ct.us
    Tel.: (860) 808-5450
    Fax: (860) 808-5591


## **CERTIFICATION**

  I hereby certify that a copy of the foregoing Affidavit of Timothy Silvis, M.D., with attached exhibits, was mailed on this 27th day of May, 2004, to:

Frank Allen Bertram, No. 74523
Adult Correctional Institution
Medium Security 1
P.O. Box 8274
Cranston, RI  02920


            ____/s/_____
            Richard T. Couture
            Assistant Attorney General