UNITED STATES DISTRICT COURT FILED

DISTRICT OF CONNECTICUT 2004 SEP 24 P 5: 00

'U.S. DISTRICT COURT
 HARTFORD, CT.

|                          |   |                              |
|--------------------------|---|------------------------------|
| FRANK ALLEN BERTRAM      | : |                              |
|                          | : | PRISONER                     |
| v.                       | : | Case No. 3:02CV1613(AVC)(TPS) |
|                          | : |                              |
| JOHN ARMSTRONG, et al.[1]| : |                              |

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Frank Allen Bertram ("Bertram"), currently
confined at the Adult Correctional Institution in Cranston, Rhode
Island, commenced this civil rights action pursuant to 28 U.S.C.
§ 1915. Bertram challenges the medical care he received while
confined in Connecticut pursuant to an agreement between
Connecticut and Rhode Island. Defendants have filed a motion for
summary judgment on several grounds. For the reasons that
follow, defendants' motion is granted.

I.   Standard of Review

In a motion for summary judgment, the burden is on the
moving party to establish that there are no genuine issues of

---

[1]The named defendants are John Armstrong, Jack Tokarz, Mark
Strange, Edward Blanchette, Timothy Silvis and the Connecticut
Department of Correction. On October 24, 2002, the court
dismissed all claims against the Connecticut Department of
Correction.

material fact in dispute and that it is entitled to judgment as a matter of law. <u>See</u> Rule 56(c), Fed. R. Civ. P.; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>White v. ABCO Engineering Corp.</u>, 221 F.3d 293, 300 (2d Cir. 2000). A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact . . . .'" <u>Miner v. Glen Falls</u>, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted). A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Aldrich v. Randolph Cent. Sch. Dist.</u>, 963 F.2d 520, 523 (2d Cir.) (quoting <u>Anderson</u>, 477 U.S. at 248), <u>cert. denied</u>, 506 U.S. 965 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present "significant probative evidence to create a genuine issue of material fact." <u>Soto v. Meachum</u>, Civ. No. B-90-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991). A party

2

may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986), cert. denied, 480 U.S. 932 (1987).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991). See also Suburban Propane v. Proctor Gas, Inc., 953 F.2d 780, 788 (2d Cir. 1992). A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements. See Securities & Exchange Comm'n v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978). Nor may he rest on the "mere allegations or denials" contained in his pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). See also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible). A self-serving affidavit which reiterates the conclusory allegations of the complaint in affidavit form is

3

insufficient to preclude summary judgment.  See <u>Lujan v. National</u>
<u>Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990).

II.  <u>Facts</u>[2]

Bertram is a Rhode Island-sentenced inmate who was
transferred to and confined in Connecticut pursuant to the
Interstate Corrections Compact.  The terms of the Interstate
Corrections Compact between Connecticut and Rhode Island require
that, absent an emergency, Connecticut must receive advance
authorization in writing from Rhode Island correctional officials
before incurring medical expenses for diagnostic and treatment
services that exceed the scope of routine health care services.

Although Bertram has been confined in Connecticut since
1991, the relevant time period for this action is from April 2000
until he was transferred back to Rhode Island on May 23, 2001.
During this period, Bertram was confined at the MacDougall
Correctional Institution ("MCI"), in Suffield, Connecticut.
Defendant Dr. Timothy Silvis is the physician who provided
medical care to inmates confined at MCI.  Defendant Dr. Edward
Blanchette is the Director of Clinical Services for the
Connecticut Department of Correction.  He is not the primary

_____

[2]Although he was afforded notice informing him of his
obligation to respond to defendants' motion, Bertram has not
opposed defendants' motion.  Accordingly, the court assumes that
the facts contained in defendants' Local Rule 56(a)1 Statement
are true.  <u>See</u> D. Conn. L. Civ. R. 56(a).

4

provider of medical services at any particular correctional institution.  Rather, he provides consultations and conducts Infectious Disease Clinics at MCI and the Bridgeport Correctional Center.

On April 20, 2000, defendant Silvis saw Bertram in response to concerns about Hepatitis C and complaints of headaches.  Sinus x-rays taken the previous month showed that Bertram suffered from mild left maxillary sinusitis.  Defendant Silvis prescribed an antihistamine and a nasal spray.

On July 6, 2000, Bertram reported to defendant Silvis that the antihistamine had not helped to resolve his headaches.  He also complained of back pain.  Defendant Silvis prescribed different sinus medications as well as Motrin for pain.  He also ordered an x-ray of Bertram's lumbar spine and another sinus x-ray.  The x-rays were taken on July 13, 2000.  The x-ray of the lumbar spine revealed some degenerative changes.  The sinus x-ray showed mild mucosal thickening of the left maxillary sinus, probably related to chronic sinusitis.

Bertram again saw Dr. Silvis on August 21, 2000, with complaints of back spasms.  Examination revealed a fair range of motion with no tenderness in the vertebral area.  Defendant Silvis discussed with Bertram the degenerative changes shown on the x-rays of his lumbar spine.  When Bertram reported that the

5

Motrin was not helping, defendant Silvis changed his medication
to Anaprox and advised Bertram not to engage in sports or weight
lifting.

On October 16, 2000, Bertram complained to the nursing staff
that his headaches had returned and that his legs felt weak.  He
requested Erythrormycin and Motrin for the headache pain.  On
October 20, 2000, defendant Silvis entered an order that these
medications be continued.

On October 25, 2000, Bertram went to the MCI infirmary.  He
told defendant Silvis that his legs were weak and he had
experienced some hesitation while urinating.  Bertram displayed
marked ataxia of the lower extremities and poor heel-to-toe gait.
Defendant Silvis submitted a request for an MRI of the head to
the Utilization Review Committee ("URC") because he thought
Bertram might have a neurological lesion.  Bertram remained in
the infirmary for monitoring.

On October 26, 2000, Bertram reported a terrible headache
accompanied by nausea.  Defendant Silvis called defendant
Blanchette, who agreed that Bertram should be sent to the
University of Connecticut Health Center ("UCHC").  Bertram was
admitted to the UCHC and remained there overnight.

At the hospital, Bertram received thorough examinations by
neurological and ENT specialists and underwent an MRI of the

6

head.  The neurological findings were inconsistent with some of
the conditions Bertram had reported.  The objective neurological
examination was normal and no further neurological workup was
considered necessary.  The MRI of the head showed no lesions.
Although it showed a small acoustic neuroma in the auditory canal
and mild chronic sinusitis, these conditions were not considered
to have caused Bertram's headache.  Upon discharge, Bertram was
considered stable; he had no further complaints of headaches and
no neck stiffness.

When he returned to MCI on October 27, 2000, Bertram was
admitted to the infirmary for continued observation.  On October
30, 2000, Bertram reported to defendant Silvis that he
experienced difficulty urinating.  Defendant Silvis ordered urine
tests which were negative.

In November 2000, while defendant Blanchette was at MCI
conducting an infectious disease clinic, Bertram stopped
defendant Blanchette in the hall of the MCI infirmary.  Bertram
expressed dissatisfaction with his visit to UCHC in October and
gave defendant Blanchette the impression that he had not been
seen or evaluated by any medical staff.  Although he was not
Bertram's primary care physician and was only at MCI to conduct
the clinic, defendant Blanchette reviewed Bertram's medical file
and informed him that he had received appropriate treatment and a

7

thorough neurological evaluation at UCHC.

Because the MRI of the head done at UCHC was negative, defendant Silvis submitted a request to the URC for an MRI of the lumbar spine. This request was forwarded to the Rhode Island Department of Correction. Upon receiving verbal approval on November 22, 2000, the MRI was scheduled for December 8, 2000. The MRI of the lumbar spine showed spinal stenosis, a degenerative disease characterized by narrowing of the spaces between the discs caused, in Bertram's case, by bulging of some of the discs. The pressure on the spinal cord associated with spinal stenosis can produce symptoms similar to those exhibited by Bertram.

One form of treatment for this condition is surgical intervention. Such surgery, however, is seldom recommended without allowing for a period of further observation and evaluation. To prepare for this future option, defendant Silvis submitted to the URC a request for a neurological evaluation and opinion.

While he was confined in the MCI infirmary, staff observed Bertram walking with what appeared to be exaggerated movements. At some times, he would be observed walking with a steady gait in a normal fashion, while at others he appeared very unsteady. On December 4, 2000, defendant Silvis observed that Bertram's

hyperflexion had improved significantly. Because of these inconsistencies, clinical assessment of Bertram's condition was difficult. On December 19, 2000, Bertram decided to leave the infirmary, making it more difficult for medical staff to monitor his condition.

Defendant Silvis received no information suggesting that Bertram experienced any further medical problems for several months. On February 2, 2001, the URC contacted defendant Silvis to determine whether, in light of Bertram's improvement, it should pursue approval from Rhode Island correctional officials for further neurological workup. Defendant Silvis noted that he would have to see Bertram before responding.

Bertram complained to nursing staff of increased numbness and inquired about a follow-up neurological consultation. Staff placed Bertram on the doctor sick call list. Defendant Silvis examined Bertram on March 19, 2001. At that time, Bertram was observed walking sometimes with the assistance of a quad cane, sometimes unassisted. Defendant Silvis noted that Bertram's complaints of problems with ambulation and sensory loss were not resolving. Therefore, on March 23, 2001, defendant Silvis submitted to the URC a follow-up request for a neurological consultation. The supporting information was forwarded to Rhode Island correctional officials for approval. While the Rhode

Island correctional officials were reviewing this request, Bertram was writing to Connecticut correctional officials regarding his request for further evaluation and treatment.

On April 25, 2001, Bertram submitted an inmate request complaining of numbness and difficulty urinating. On April 30, 2001, Bertram reported to defendant Silvis that his instability was worsening. Defendant Silvis ordered Bertram to remain in the MCI infirmary for his safety despite Bertram's refusal to be admitted. On May 9, 2001, defendant Silvis observed Bertram easily ambulating around the infirmary with his quad cane. The following day, Bertram signed himself out of the infirmary. Defendant Silvis did not see Bertram again before he was returned to Rhode Island.

On February 23, 2001, Bertram filed a petition for writ of habeas corpus in state court. He sought further evaluation and treatment for his degenerative back condition and asked that the court order that defendant Blanchette personally oversee his case. In response to the petition and at the request of the Office of the Attorney General, defendant Blanchette reviewed Bertram's complete medical file. Because Bertram's condition could require future surgical intervention, defendant Blanchette advised that Bertram be returned to Rhode Island. This would enable approvals for any non-routine medical treatment to be

10

obtained more expeditiously.  Correctional officials agreed with
defendant Blanchette's recommendation and Bertram was returned to
Rhode Island on May 23, 2001.

In Rhode Island, Bertram was evaluated and approved for
housing in general population.  He was put on waiting lists for
orthopedic and neurological consultations.  In November 2001, he
underwent MRIs of the lumbar and thoracic spine.  The MRI of the
lumbar spine revealed only mild degenerative disc disease and an
associated annulus tear.  The MRI of the thoracic spine revealed
an elongated cystic area.  A follow-up MRI of the thoracic done
in December 2001, showed what was thought to be an arachnoid
cyst.

Bertram first saw an outside consultant on January 23, 2002,
eight months after his return.  Although Bertram's primary
complaint while in Connecticut had been persistent headaches, he
reported no problems with his head or neck.  The consultant
recommended surgery to drain the cyst.  Symptoms noted in the
October 2000 Connecticut neurological examination had worsened by
January 2002.  Bertram underwent surgery in February 2002 and
February 2003.  By October 2003, Bertram's neurological condition
had improved considerably and he was walking independently.

III. Discussion

Bertram asserts two claims in his complaint:  deliberate

11

indifference to a serious medical need in violation of the Eighth Amendment's proscription against cruel and unusual punishment and denial of his Fourteenth Amendment right to equal protection. Defendants argue that they have not violated any of Bertram's constitutionally protected rights. Alternatively, they contend that they are protected by qualified immunity. The court considers below the two claims raised in the complaint.

A.    Deliberate Indifference to a Serious Medical Need

Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). To prevail on such a claim, however, Bertram must allege "acts or omissions sufficiently harmful to evidence deliberate indifference" to a serious medical need. Id. at 106. He must show intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel. See id. at 104-05. Mere negligence will not support a section 1983 claim; the conduct complained of must "shock the conscience" or constitute a "barbarous act." McCloud v. Delaney, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970)).

"Medical malpractice does not become a constitutional

12

violation merely because the victim is a prisoner." <u>Estelle</u>, 429
U.S. at 106.  A treating physician will be liable under the
Eighth Amendment only if his conduct is "repugnant to the
conscience of mankind." <u>Tomarkin v. Ward</u>, 534 F. Supp. 1224,
1230 (S.D.N.Y. 1982) (quoting <u>Estelle</u>, 429 U.S. at 105-06).
Inmates do not have a constitutional right to the treatment of
their choice.  <u>See Dean v. Coughlin</u>, 804 F.2d 207, 215 (2d Cir.
1986).  Thus, mere disagreement with prison officials about what
constitutes appropriate care does not state a claim cognizable
under the Eighth Amendment.  <u>See Ross v. Kelly</u>, 784 F. Supp. 35,
44 (W.D.N.Y.), <u>aff'd</u>, 970 F.2d 896 (2d Cir.), <u>cert. denied</u>, 506
U.S. 1040 (1992).

There are both subjective and objective components to the
deliberate indifference standard.  <u>See Hathaway v. Coughlin</u>, 37
F.3d 63, 66 (2d Cir. 1994), <u>cert. denied sub nom.</u> <u>Foote v.</u>
<u>Hathaway</u>, 513 U.S. 1154 (1995).  The alleged deprivation must be
"sufficiently serious" in objective terms.  <u>Wilson v. Seiter</u>, 501
U.S. 294, 298 (1991).  <u>See also</u> <u>Nance v. Kelly</u>, 912 F.2d 605, 607
(2d Cir. 1990) (Pratt, J., dissenting) ("'serious medical need'
requirement contemplates a condition of urgency, one that may
produce death, degeneration, or extreme pain").  The Second
Circuit has identified several factors that are highly relevant
to the inquiry into the seriousness of a medical condition:

13

"'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'"  Chance v. Armstrong, 143 F.3d 698, 702 (2d. Cir. 1998) (citation omitted).  In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious.  See Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000).

Defendants do not dispute that Bertram has a serious medical need.  Thus, for purposes of deciding this motion, the court assumes that the Bertram's condition satisfies the requirement of a serious medical need.

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, Bertram also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind."  Hathaway, 37 F.3d at 66.  "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  Id. (quoting

14

<u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994)).

      1.   <u>Defendant Silvis</u>

The evidence presented by defendants demonstrates that defendant Silvis consistently provided treatment for Bertram's complaints.  He prescribed various medications, ordered x-rays and requested URC approval for additional tests.  When Bertram reported that his headaches had increased in severity, defendants Silvis and Blanchette immediately had him transported to UCHC.

Bertram argues that no follow-up MRI of the head was conducted despite the fact that a specialist at UCHC had suggested it as a possibility for the future.  This was a suggestion only.  The facts that Bertram's headaches were resolving after his October 2000 admission to UCHC, and that no MRI of the head was ordered after his return to Rhode Island, suggest that failure to follow-up on this suggestion does not show deliberate indifference to Bertram's medical needs.

Although Bertram may not have received non-routine testing as quickly as he may have liked, he has presented no evidence in opposition to the motion for summary judgment suggesting that defendant Silvis was responsible for any delay.  Rather, defendants have provided evidence that the need for approval by Connecticut and Rhode Island officials was the cause of the delay in treatment.

15

In addition, Bertram has presented no evidence suggesting that defendant Silvis failed to follow the orders of any specialist. While Bertram disagrees with the treatment prescribed, he has provided no evidence to suggest that defendant Silvis possessed "a sufficiently culpable state of mind." Hathaway, 37 F.3d at 66. Accordingly, defendants' motion for summary judgment is granted as to all claims against defendant Silvis.

### 2.    Defendant Blanchette

Defendant Blanchette was at no time Bertram's primary care physician. His only involvement is that he agreed with defendant Silvis that Bertram should be taken to UCHC on October 26, 2000, reviewed Bertram's medical file in response to Bertram's statements in the hallway regarding the UCHC visit and recommended that Bertram be returned to Rhode Island in connection with his review of the state habeas petition. Although Bertram alleges that he wrote to defendant Blanchette, defendants have no record of a letter and Bertram has not provided a copy of the letter in response to the motion for summary judgment.

Bertram has presented no evidence in opposition to defendants' motion to suggest that defendant Blanchette failed to act reasonably in these instances. Because Bertram has presented

16

no evidence to show that defendant Blanchette was deliberately indifferent to his medical needs, defendants' motion for summary judgment is granted as to all claims against defendant Blanchette.

3. Defendants Strange, Tokarz and Armstrong

Defendants Warden Strange, Deputy Commissioner Tokarz and Commissioner Armstrong are not medical professionals.

Bertram alleges that he handed defendant Strange a note complaining of difficulty obtaining medical treatment for his back and that he had been told that any treatment must be approved by the URC and Rhode Island correctional officials. He also alleges that defendant Strange made inquiries and told him that treatment could not be provided without the approval of Rhode Island correctional officials. Defendant Strange does not recall this encounter and has no record of a note from Bertram.

Bertram also alleges that he sent a letter to Commissioner Armstrong on March 23, 2001, complaining about the delay in medical treatment caused by the need for double approvals. Defendant Tokarz responded to the letter and told Bertram that updated information on his condition had been forwarded to Rhode Island correctional officials for approval of further evaluation.

None of these defendants ignored Bertram's requests for assistance. They checked with medical staff and reported that

17

reports had been forwarded to Rhode Island and further treatment required approval from Rhode Island correctional officials. Bertram has presented no evidence that these defendants ignored his requests. Rather, they reasonably relied on information provided by medical staff. See Ross v. Kelly, 784 F. Supp. 35, 46 (W.D.N.Y.) (deference by prison officials to medical opinions of prison doctors is "understandable and appropriate"), aff'd, 970 F.2d 896 (2d Cir.), cert. denied, 506 U.S. 1040 (1992); McEachern v. Civitelli, 502 F. Supp. 532, 534 (N.D. Ill. 1980) (prison administrators without medical expertise "must necessarily place their confidence in the reports of prison doctors whenever an inmate disputes a medical opinion as to what treatment is necessary and proper"). Accordingly, defendants' motion for summary judgment is granted as to all claims against defendants Strange, Tokarz and Armstrong.

B.    Equal Protection

In his claims for relief, Bertram alleges that by denying him timely access to consultations with specialists and providing such access to other similarly situated inmates, defendant have denied him equal protection of the law. Bertram does not identify or further describe any similarly situated inmates in the complaint and has not responded to the motion for summary judgment.

18

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." This provision does not mandate identical treatment for each individual; rather it requires that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

"To state an equal protection claim, a plaintiff must charge a government officer 'not only with deliberately interpreting a statute against the plaintiff, but also with singling him out alone for that misinterpretation.'" Brady v. Town of Colchester, 863 F.2d 205, 216 (2d Cir.1988) (citation omitted). State legislation that creates suspect or "quasi-suspect" classifications or that impinges a fundamental right is subject to heightened judicial scrutiny. City of Cleburne, 473 U.S. at 439. All other classifications are valid if they are "rationally related to a legitimate state interest." Id. at 440. The court does not apply a heightened standard of review to prisoner claims because prisoners "either in the aggregate or specified by offense" are not a suspect class. Lee v. Governor of New York, 87 F.3d 55, 60 (2d Cir.1996).

Bertram is not a member of a suspect class. Thus, to assert an equal protection claim, he must allege that he was treated differently from other inmates in similar circumstances and that

19

the unequal treatment was the result of intentional discrimination.

Defendants have provided evidence that any non-routine medical care must be approved by the sending state. This practice is premised on the fact that such care would be paid for by the sending state. Bertram has provided no evidence of any interstate compact inmate who was treated differently. Thus, he fails to meet his burden in opposition to defendants' motion for summary judgment. Defendants' motion for summary judgment is granted on this ground as well.

IV.  Conclusion

Defendants' motion for summary judgment [**doc. #26**] is **GRANTED**. The Clerk is directed to enter judgment and close this case.

SO ORDERED this _____ day of September, 2004, at Hartford, Connecticut.

_____
Alfred V. Covello
United States District Judge